[No. H033097. Sixth Dist. Mar. 15, 2010.]

WATSONVILLE PILOTS ASSOCIATION et al., Plaintiffs and Appellants,
v.
CITY OF WATSONVILLE et al., Defendants and Appellants;
DEPARTMENT OF TRANSPORTATION, Defendant and Respondent.
FRIENDS OF BUENA VISTA et al., Plaintiffs and Appellants, v.
CITY OF WATSONVILLE et al., Defendants and Appellants;
DEPARTMENT OF TRANSPORTATION, Defendant and Respondent.

1064

COUNSEL

Wittwer & Parkin, Jonathan Wittwer, William P. Parkin, Jennifer M. Bragar, Ryan D. Moroney; and Alexander T. Henson for Plaintiffs and Appellants.

Jarvis, Fay, Doporto & Gibson, Andrea J. Saltzman, Rick W. Jarvis; Grunsky, Ebey, Farrar & Howell and Alan J. Smith for Defendants and Appellants.

Ronald W. Beals, Thomas C. Fellenz, Manuel C. Alvarado and Raiyn Bain-Moore for Defendant and Respondent.

OPINION

**MIHARA, J.**—Appellant City of Watsonville (the City) certified a final environmental impact report (FEIR) and approved "the Watsonville Vista 2030 General Plan" (the 2030 General Plan) to replace its previous general plan. The 2030 General Plan contemplated residential development in an unincorporated area known as Buena Vista that is located adjacent to the Watsonville Municipal Airport (the Airport). Respondents Friends of Buena Vista (Friends),[1] Watsonville Pilots Association (Pilots), and Sierra Club filed mandamus petitions challenging the certification of the FEIR and the approval of the 2030 General Plan on the grounds that the 2030 General Plan violated the State Aeronautics Act (SAA) (Pub. Util. Code, § 21001 et seq.) and the City's certification of the FEIR violated the California Environmental Quality Act (CEQA) (Pub. Resources Code § 21000 et seq.) because the FEIR failed to adequately analyze the impact of the 2030 General Plan on aviation, traffic, and the water supply, and failed to consider a reasonable range of alternatives. The trial court found that the 2030 General Plan violated the SAA, and the City's certification of the FEIR violated CEQA because the FEIR did not adequately analyze the impact of the 2030 General Plan on aviation or traffic and failed to consider a reasonable range of alternatives. The court issued a writ of mandate.

On appeal, the City contends that the 2030 General Plan does not violate the SAA and the FEIR adequately analyzed the impact of the 2030 General Plan on aviation and considered a reasonable range of alternatives.[2] In their cross-appeal, Pilots and Sierra Club contend that the trial court erred in failing to find that the FEIR did not adequately analyze the impact of the

[1] Friends is an association of property owners in the Buena Vista area.

[2] The trial court found that the FEIR failed to consider the traffic impacts on State Highway 1. The City does not challenge this finding. It concedes that the FEIR failed to adequately analyze the impact of the 2030 General Plan on traffic.

2030 General Plan on the water supply. We conclude that the trial court correctly concluded that the 2030 General Plan violates the SAA and that the City's certification of the FEIR violated CEQA, and the court did not err in failing to find that the FEIR inadequately analyzed the impact of the 2030 General Plan on the water supply. Accordingly, we affirm the judgment.

## I. Factual Background

The City owns the Airport, which is located at the northern boundary of the City. The Airport has two runways: a main runway, designated "2-20," and a Crosswind Runway, designated "8-26." Runway 8-26 accounts for about 12 percent of the usage of the Airport.[3] The Buena Vista area is located north and west of the Airport, outside the City's boundaries but adjacent to the City's north edge (and the Airport) and within the City's sphere of influence.

The City initiated the general plan revision process in October 2003. The proposed 2030 General Plan contemplated the development of 5,700 additional units of housing, with about 40 percent of these units to be located in the Buena Vista area. The Buena Vista area accounted for 75 percent of the potentially developable land in the areas that the City targeted for its future growth in the proposed 2030 General Plan.

In March 2005, Watsonville Community Development Director John T. Doughty recommended that the City modify the 2003 WAMP to (1) designate the Runway 8 end of Runway 8-26 "as a Low Activity Runway . . . eliminating Safety Compatibility Zone 3 [(Inner Turning Zone)]" and (2) amend the "Basic Compatibility Standards to permit children's schools, day care centers, hospitals and nursing homes within Safety Compatibility Zone 6 (Traffic Pattern Zone)." Zone 3 restricts residential uses to "very low densities," prohibits children's schools, large daycare centers, hospitals, and nursing homes, and requires that shopping centers, restaurants, theaters and other nonresidential uses with moderate to higher usage intensities be avoided. Zone 6 permits residential uses but requires that children's schools, large daycare centers, hospitals, and nursing homes be avoided. Zones 3 and 6 cover significant portions of the Buena Vista area. Doughty explained that, "without revision to the Runway 8 safety-compatibility zones, there could be a substantial loss in development/housing capacity within the Buena Vista Future Growth Area."

---

[3] The Watsonville Municipal Airport Master Plan 2001–2020, adopted in 2003 (2003 WAMP) found that the Runway 8 end of Runway 8-26 accounted for 5 percent of airport usage and the Runway 26 end accounted for 7 percent of airport usage. The 2003 WAMP stated that annual airport operations in 2000 were 122,890 and were projected to increase to 130,190 by 2010 and 144,503 by 2020.

In April 2005, the City adopted resolution No. 74-05, by a vote of four to three, and modified the 2003 WAMP in a variety of respects, including, as to Runway 8, as recommended by Doughty, eliminating Zone 3 and "eliminat-[ing] schools, day care centers, nursing homes and hospitals as uses to avoid in Safety Compatibility Zone 6."

The proposed 2030 General Plan divided the Buena Vista area into three sections. Buena Vista I is the largest of these sections, and the 2030 General Plan projected that it would be built first, with Buena Vista II and Buena Vista III being built after it in that order. The 2030 General Plan projected the development of single-family housing, townhomes, and apartments in all three sections. Altogether, the 2030 General Plan contemplated the development of 2,250 new dwelling units in the Buena Vista area. While the 2030 General Plan acknowledged that there were "[s]afety issues regarding compatibility between airport operations and the surrounding environment includ-[ing] noise impacts, ground safety, and flight hazards," it asserted that these issues would be addressed by the "Airport Safety Committee" and updates to the 2003 WAMP.

A draft EIR (DEIR) was circulated for the 2030 General Plan in September and October 2005. In May 2006, the City certified the FEIR[4] and adopted a statement of overriding considerations relating to the 2030 General Plan. The City found that there were three significant, unavoidable environmental impacts that could not be mitigated: "increased population and housing, the loss of prime farmland, and the potential to impact groundwater supply by potential increased water usage . . . ." The City concluded that the benefits of the 2030 General Plan outweighed these impacts.[5] The City then adopted the 2030 General Plan.

## II. Procedural Background

Pilots, Friends, and Sierra Club filed mandate petitions challenging the City's certification of the FEIR and adoption of the 2030 General Plan. The operative petitions are the second amended petition filed by Pilots and Sierra Club and the amended petition filed by Friends. The named respondents were

---

[4] An FEIR consists of the draft EIR, comments, and responses to those comments. (Cal. Code Regs., tit. 14, div. 6, ch. 3 (hereafter CEQA Guidelines), § 15132.) "In interpreting CEQA, we accord the [CEQA] Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).)

[5] A public agency may approve a project that will have a significant effect on the environment only if the agency finds that the effect is unavoidable and the benefits of the project outweigh the policy of avoiding such effects. (CEQA Guidelines, § 15043; Pub. Resources Code, § 21081.)

the City, its city council,[6] and California's Department of Transportation, Division of Aeronautics (CDOA).[7] The petitions alleged that the City had failed to comply with the SAA and violated CEQA.[8] The City had allegedly violated CEQA because the FEIR failed to adequately address airport safety concerns, traffic impacts, and water supply issues, and inadequately analyzed project alternatives. The City filed answers to both petitions.

The petitions were consolidated and tried to the court. In March 2008, the trial court issued a statement of decision explaining its decision to grant the petitions. The court found that the City had violated both the SAA and CEQA. The court found multiple CEQA violations. It concluded that the FEIR had inadequately analyzed aviation impacts and traffic impacts and had failed to consider a reasonable range of alternatives. The court rejected the claim that the FEIR failed to adequately analyze the impact of the 2030 General Plan on the water supply.

In May 2008, the court entered judgment for Pilots, Sierra Club, and Friends against the City and issued a peremptory writ of mandate directing the City to set aside its certification of the FEIR, its approval of the 2030 General Plan, and its 2005 resolution amending the 2003 WAMP. In June 2008, the City filed a timely notice of appeal. Pilots and Sierra Club filed a notice of cross-appeal in July 2008.

### III. The City's Appeal

The City contends that the trial court erred in concluding that the 2030 General Plan violated Public Utilities Code section 21670.1, subdivision (e) (one of the SAA's provisions) and erred in finding that the FEIR inadequately analyzed impacts on aviation and failed to analyze a reasonable range of alternatives.

### A. Violation of Public Utilities Code Section 21670.1

The trial court found that the City had violated the SAA "by failing to adopt the safety and density criteria established in the Airport Land Use Planning Handbook[,] . . . by unlawfully eliminating Airport Safety Zone 3, altering the allowed housing densities in Zone 3 and then deleting the restrictions on the special functions of Airport Safety Zone 6." This finding

---

[6] We will refer to the City and its city council jointly as the City.

[7] The petitions alleged that CDOA had failed to enforce the SAA. The trial court's writ did not grant any relief against CDOA.

[8] We do not delineate the other contentions in the petitions or list all of the CEQA claims raised in the petitions; we restrict ourselves to those claims which are at issue in this appeal.

was based on the court's conclusion that the "Airport Safety Zone[s]" in the CDOA's Airport Land Use Planning Handbook (the Handbook) constituted " 'safety criteria' " within the meaning of Public Utilities Code section 21670.1, subdivision (e).

The City contends that the trial court erred because Public Utilities Code section 21670.1, subdivision (e) does not require the City to *adopt all* of the zones and restrictions in the Handbook but only to "incorporate the *essential components* of the Handbook's criteria . . . ." It argues: "Subdivision (e) simply does not require the City to adopt each zone and every criterion in the Handbook; only *the 'elements' of the criteria* need be adopted to avoid forming an ALUC."

■ "We begin as always 'with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent.' [Citation.] To discover that intent we first look to the words of the statute, giving them their usual and ordinary meaning. [Citations.] 'Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citation.]" (*Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259].)

" 'We do not, however, consider the statutory language "in isolation." . . . Rather, we look to the "entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . ." . . . That is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute . . . .' . . ." . . . We must harmonize "the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole." ' " (*Authority for California Cities Excess Liability v. City of Los Altos* (2006) 136 Cal.App.4th 1207, 1213 [39 Cal.Rptr.3d 571].)

■ " '[I]f the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.] In the end, we " 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' [Citation.] [¶] The interpretation of a statute is a question of law, which we review de novo. [Citation.]" (*State Bd. of Equalization v. Superior Court* (2006) 138 Cal.App.4th 951, 956 [42 Cal.Rptr.3d 116].)

■ Article 3.5 of chapter 4 of part 1 of division 9 of the Public Utilities Code (article 3.5) governs airport land use commissions (ALUC's).[9] "It is the purpose of this article to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around public airports to the extent that these areas are not already devoted to incompatible uses." (Pub. Util. Code, § 21670, subd. (a)(2).) The role of an ALUC is to "formulate an airport land use compatibility plan that will provide for the orderly growth of each public airport and the area surrounding the airport within the jurisdiction of the commission, and will safeguard the general welfare of the inhabitants within the vicinity of the airport and the public in general." (Pub. Util. Code, § 21675, subd. (a).) The membership of each ALUC must include at least two aviation experts. (Pub. Util. Code, §§ 21670, subd. (b)(3), 21670.1, subd. (b).)

■ Every county in which there is an airport "operated for the benefit of the general public" is required to establish an ALUC unless "the board of supervisors of the county . . . after consultation with the appropriate airport operators and affected local entities and after a public hearing, adopt[s] a resolution finding that there are no noise, public safety, or land use issues affecting any airport in the county which require the creation of a commission and declaring the county exempt from that requirement." (Pub. Util. Code, § 21670, subd. (b).) This exception applies only where the CDOA "determines" that the county's alternative "processes" will "[r]ely on the height, use, noise, safety, and density criteria that are compatible with airport operations, as established by [the Handbook]." (Pub. Util. Code, § 21670.1, subd. (c)(3)(B).)

There is another exception to the requirement that every county must establish an ALUC, and this exception is the one at issue here.[10] "[An ALUC] need not be formed in a county if all of the following conditions are met: [¶] (A) The county has only one public use airport that is owned by a city. [¶] (B)(i) *The county and the affected city* **adopt the elements** *in paragraph (2) of subdivision (d), as part of their general and specific plans for the county and the affected city.* [¶] (ii) The general and specific plans shall be submitted, upon adoption, to the Division of Aeronautics. If the county and the affected city do not submit the elements specified in paragraph (2) of subdivision (d), on or before May 1, 1996, then a commission shall be

---

[9] Article 3.5 mandates that the CDOA create the Handbook and that the Handbook contain "identification of essential elements that should be included in the airport land use compatibility plans." (Pub. Util. Code, §§ 21674.5, subd. (b)(3), 21674.7, subd. (a).)

[10] Los Angeles County and San Diego County are excepted from the ALUC requirement. (Pub. Util. Code, §§ 21670.2, 21670.3.) Subdivision (d) of Public Utilities Code section 21670.1 contains a special exception for Kern County.

established in accordance with this article."[11] (Pub. Util. Code, § 21670.1, subd. (e), italics added.) "Paragraph (2) of subdivision (d)" of Public Utilities Code section 21670.1 provides: "(2) *Incorporated* the height, use, noise, safety, and density criteria that are compatible with airport operations as established by [the Handbook] and any applicable federal aviation regulations . . . as part of the general and specific plans for the county and for each affected city." (Pub. Util. Code, § 21670.1, subd. (d)(2), italics added.)

In enacting article 3.5, the Legislature provided for the Handbook to play several different roles. First, where a county *has* established an ALUC, a body that must include aviation experts, the "airport land use compatibility plan" that the ALUC prepares "shall be *guided by information*" in the Handbook (Pub. Util. Code, § 21674.7, subd. (a), italics added) and "*local agencies shall be guided by* the height, use, noise, safety, and density *criteria* . . . established by [the Handbook] . . ." (Pub. Util. Code, § 21674.7, subd. (b), italics added). We will refer to these counties as "ALUC counties." Second, if no ALUC has been established, but a county's board of supervisors has adopted a resolution finding "that there are no noise, public safety, or land use issues affecting any airport" (Pub. Util. Code, § 21670, subd. (b)) and established an alternative procedure for airport planning, this alternative procedure must "[r]ely on the height, use, noise, safety, and density criteria . . . established by [the Handbook]." (Pub. Util. Code, § 21670.1, subd. (c)(3)(B).) We will refer to these counties as "alternative-procedure counties." Finally, in the situation at issue here, where a county has neither established an ALUC nor adopted a no-issues resolution and an alternative procedure, the county and each affected city must "adopt the elements" that "[i]ncorporate[]" the "criteria" in the Handbook. (Pub. Util. Code, § 21670.1, subds. (d), (e).) We will refer to such a county as a "no-procedure county."

"Where different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 [81 Cal.Rptr.2d 471, 969 P.2d 564].) Because the Legislature used distinctly different words to describe how the Handbook's criteria should be utilized in these different types of counties, we must presume that the Legislature intended to mandate different treatment of the criteria in each of these three types of counties.

"When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122 [29 Cal.Rptr.3d 262, 112 P.3d 647].) "Criteria" means "a standard on which a

---

[11] It appears that this exception is applicable solely to Santa Cruz County.

judgment or decision may be based." (Merriam-Webster's Collegiate Dict. (10th ed. 1993) p. 275.) "Guide" means "to direct, supervise, or influence." (Merriam-Webster's Collegiate Dict., *supra*, at p. 517.) "Rely" means "to be dependent." (Merriam-Webster's Collegiate Dict., *supra*, at p. 988.) "Adopt" means "to accept formally and put into effect." (Merriam-Webster's Collegiate Dict., *supra*, at p. 16.) "Incorporated" means "united in one body." (Merriam-Webster's Collegiate Dict., *supra*, at p. 589.) "Element" means "a constituent part." (Merriam-Webster's Collegiate Dict., *supra*, at p. 373.) These definitions reflect that local agencies in ALUC counties should be "influenced" by the Handbook's criteria, a fairly mild mandate; alternative-procedure counties should be "dependent" on the Handbook's criteria, a stronger mandate; and an affected city in a no-procedure county must "accept" and "put into effect" the Handbook's criteria by "unit[ing]" the criteria with the city's general plan, a very strong mandate.

Unlike the City, we can see nothing in the statutory language which indicates that the Legislature intended to grant discretion to an affected city in a no-procedure county to decide which of the Handbook's criteria should be incorporated into such a city's general plan. Instead, the Legislature's word choices strongly indicate that it wished to grant discretion in ALUC counties, limited discretion in alternative-procedure counties, and no discretion in no-procedure counties.

Nor is there anything in the legislative history of the 1994 creation of subdivisions (d) and (e) of Public Utilities Code section 21670.1 to suggest that the Legislature did not intend to mandate the adoption of all of the Handbook's criteria by an affected city in a no-procedure county.[12] Although counties with general use airports had been required to have an ALUC under a 1984 law, that mandate was suspended beginning in 1990 and repealed in 1993. Assembly Bill No. 2831 (1993–1994 Reg. Sess.) was introduced in 1994 because "[p]ilots and planners fear that without ALUCs' special planning mandates builders can convince local officials to let them develop in ways that will result in land use conflicts, noise problems, and even safety hazards." (Sen. Com. on Local Government, Rep. on Assem. Bill No. 2831 (1993–1994 Reg. Sess.) as amended May 31, 1994, p. 1.) The initial versions of Assembly Bill No. 2831 would have required the County of Santa Cruz to have an ALUC or its equivalent, and the City opposed the bill. (Assem. Amend. to Assem. Bill No. 2831 (1993–1994 Reg. Sess.) May 31, 1994; Sen. Com. on Local Government, Analysis of Assem. Bill No. 2831

---

[12] The trial court took judicial notice of the legislative history of the 1994 amendment of Public Utilities Code section 21670.1 to add subdivisions (d) and (e), and the parties have included it in the record on appeal.

(1993–1994 Reg. Sess.) as amended May 31, 1994.) The bill was subsequently amended to add subdivisions (d) and (e). (Sen. Amend. to Assem. Bill No. 2831 (1993–1994 Reg. Sess.) Aug. 8, 1994.)

 None of the relevant legislative history materials discuss the meaning of the specific wording at issue here. Thus, all we can glean from the legislative history is that the 1994 amendment of Public Utilities Code section 21670.1 was intended to prevent local agencies from allowing development "that will result in land use conflicts, noise problems, and even safety hazards." Such an intent is perfectly consistent with requiring an affected city in a no-procedure county to adopt all of the Handbook's criteria and inconsistent with allowing such a city to choose to adopt only some of those criteria.

The City contends that language in the 1993 Handbook, which states that the 1993 Handbook was not intended to establish "standards" but to provide information about "concepts and processes," establishes that the Legislature did not intend to *mandate* that an affected city in a no-procedure county adopt the specific criteria in the Handbook but intended to require only that such a city adopt some subset of those criteria. This contention lacks merit.

When the Legislature amended Public Utilities Code section 21670.1 in 1994 to add subdivisions (d) and (e), which contain the rules applicable to no-procedure counties, the current version of the Handbook was the December 1993 version (the 1993 Handbook). The 1993 Handbook consists of three parts: (1) ALUC procedures and plans (Part I); (2) an assessment of airport land use compatibility issues (Part II); and (3) appendices (Part III). It is only Part II which contains any "criteria." Part II consists of chapters on the "[c]haracteristics"[13] of noise and aircraft accidents and chapters on noise and safety "[c]ompatibility [p]olicy [i]ssues."

Chapter 9 of Part II is the chapter addressing safety compatibility policy issues, and it begins by discussing the various state and federal regulations governing airport safety. After noting that the previous version of the Handbook (the 1983 version) had "proposed" the "[e]stablishment of up to five separate [safety] zones," chapter 9 proceeds to a discussion of "Safety Zone Alternatives." This discussion begins by explicitly identifying its subject matter as "safety zones and associated criteria aimed at reducing the severity of aircraft accidents." When chapter 9 proceeds to a discussion of "Application to Individual Airports," the 1993 Handbook prefaces this section with the following text: "It must be emphasized that the safety zone shapes and sizes described here are merely presented to illustrate the concepts discussed.

---

[13] All original boldface has been omitted from quotations to enhance readability.

Although they may serve as a useful starting point for individual compatibility plan development, these particular safety zones are not intended to represent Caltrans' recommendations, guidelines, or standards. Most compatibility plans do not now include all of the zones shown here, nor is it required for them to do so. Many ALUCs likely will find it appropriate to continue to use the safety zones they have already established."

The "Application" section of chapter 9 of the 1993 Handbook contains a figure that identifies and graphically displays six safety zones with specific dimensions given for each zone based on the length of the runway in question. This figure is accompanied by the following text: *"Note: These safety zone shapes and sizes are intended only to illustrate the concepts discussed in the text. They do not represent standards or recommendations."* Chapter 9 also specifically identifies the "Acceptable Forms of Development" for each of these six safety zones. The development restrictions are prefaced: "[T]he following guidelines are suggested as a good starting point especially in light of ALUCs' fundamental responsibility to promote a high degree of compatibility between airports and surrounding land uses." Throughout chapter 9, the 1993 Handbook repeatedly refers to its "guidelines" and "illustrations" as "criteria."

While the 1993 Handbook is useful in determining the Legislature's intent when it enacted the language requiring the City to "adopt the elements" that "[i]ncorporate[]" the criteria in the Handbook, the City's reliance on prefatory language in the 1993 Handbook ignores the fact that this language was included in the 1993 Handbook at a time when the Legislature had not yet enacted any statutes that required any entity to be "guided by," "rely on" or "adopt" the Handbook's criteria. All of these statutory references to the Handbook were enacted by the Legislature in a single bill in *1994.* (Stats. 1994, ch. 644, §§ 3 [Pub. Util. Code, § 21670.1], 4 [Pub. Util. Code, § 21674.7], pp. 3124, 3126.) Thus, the fact that the *1993* Handbook repeatedly states that its criteria are not standards or recommendations does not suggest that the Legislature did not subsequently decide that those criteria *should serve as standards* in the absence of an ALUC or an alternative procedure that would provide the expert guidance that the Legislature deemed necessary to the creation of suitable airport safety criteria.

The 2002 Handbook, on the other hand, was developed *after* the Legislature's 1994 amendments to Public Utilities Code section 21670.1. The 2002 Handbook does not contain the prefatory language that the 1993 Handbook contained and that the City relies upon. Instead, the 2002 Handbook describes its criteria as "guidelines . . . for establishing safety compatibility policies for areas around airports." It also explicitly addresses the meaning of the Public Utilities Code section 21670.1, subdivision (e) exception that the City seeks

to exploit. "Specifically, the statutes require that the county and the affected city include within their general plans and any specific plans compatibility criteria which are consistent with the 1993 *Handbook.*"

The 2002 Handbook is organized in the same fashion as the 1993 Handbook, and, as is true for the 1993 Handbook, the criteria are contained in chapter 9. In chapter 9, the 2002 Handbook acknowledges the transformation of its role by the 1994 legislation. "The [1994 legislation] changed the role of the *Handbook* from a useful reference document to one that must be used as guidance in the development of ALUC policies. This is particularly important in the development of safety compatibility policies, because very little guidance is otherwise available for civilian airports."

Like the 1993 Handbook, the 2002 Handbook has an "Application" section which contains "a set of safety zones and compatibility criteria applicable within each zone." This section is prefaced with the following statement: "While the material presented here is intended to represent Department of Transportation guidance, it is not the intent or expectation that the methodologies or examples constitute the only acceptable approaches to the issue of airport land use safety compatibility." The 2002 Handbook, like the 1993 Handbook, identifies six "safety zones." The 2002 Handbook contains descriptions of the "Qualities" of each of the six safety zones. The "Basic Compatibility Qualities" of Zone 3 are described as: (1) "Limit residential uses to very low densities (if not deemed unacceptable because of noise)"; (2) Avoid nonresidential uses having moderate or higher usage intensities (e.g., major shopping centers, fast food restaurants, theaters, meeting halls, buildings with more than three aboveground habitable floors are generally unacceptable)"; (3) "Prohibit children's schools, large day care centers, hospitals, nursing homes"; and (4) "Avoid hazardous uses (e.g. aboveground bulk fuel storage)." Zone 6's qualities are described as: (1) "Allow residential uses"; (2) "Allow most nonresidential uses; prohibit outdoor stadiums and similar uses with very high intensities"; and (3) "Avoid children's schools, large day care centers, hospitals, nursing homes." These "qualities" are accompanied by definitions of their terms. "Avoid" is defined as "[u]se generally should not be permitted unless no feasible alternative is available." "Prohibit" is defined as "[u]se should not be permitted under any circumstances."

The 2002 Handbook provides no support for the City's claim that the Legislature did not intend to mandate that an affected city in a no-procedure county adopt all of the Handbook's criteria. First, the 2002 Handbook did not exist in 1994 when the Legislature enacted the language in question, so it cannot tell us what the Legislature then intended. Second, to the extent that the 2002 Handbook represents the CDOA's interpretation of the statutory

language, it rebuts the City's claim that the criteria are discretionary. The 2002 Handbook requires the City to include in its general plan criteria "consistent with" the Handbook's criteria. Third, while the 2002 Handbook contains some prefatory language, this language is clearly directed at ALUC counties and alternative-procedure counties where some discretion exists for criteria to be developed by a legislatively approved process.

The City acknowledges that chapter 9 of the Handbook contains " 'a set of specific safety compatibility criteria guidelines,' " but it urges that the contours of these zones and the nature of the compatibility criteria are left to the discretion of the local agency because the criteria "depend on *each locality's* answer to the basic questions" about how much risk it is willing to accept. (Italics added.) This claim directly conflicts with the Legislature's intent in enacting the 1994 legislation. The Legislature explicitly stated that the 1994 statutes were intended "to discourage incompatible land uses near existing airports." (Pub. Util. Code, § 21674.7, subd. (b).) Allowing an affected city in a no-procedure county to pick and choose among the Handbook's criteria would do nothing to discourage incompatible land uses near the affected city's airport.

The City admits that it "omitted one zone and one guideline" as to Runway 8, but it argues that the 2030 General Plan was nevertheless consistent with the Handbook's criteria because the City made a finding that Runway 8 was a "low-activity runway" as defined in the 2002 Handbook.

The 2002 Handbook, unlike the 1993 Handbook, discusses the differences between a "General Aviation Runway" and a "Low-Activity General Aviation Runway." A "Low-Activity General Aviation Runway" is less than 4,000 feet long and has fewer than 2,000 takeoffs and landings per year "at individual runway end." The example that the 2002 Handbook shows for a "Low-Activity General Aviation Runway" does not depict a Zone 6. The examples are accompanied by this statement: "These examples are intended to provide general guidance for establishment of airport safety compatibility zones. They do not represent California Department of Transportation standards or policy." (Italics omitted.) The 2002 Handbook's discussion of "Low-Activity Runways" explains that any modifications of the safety zones due to low activity depend upon the circumstances. The 1993 Handbook did not mention low-activity runways.

There is no merit to the City's claim that its designation of Runway 8 as a "low-activity runway" renders its elimination of Zone 3 and elimination of development restrictions in Zone 6 consistent with the Handbook's criteria. First, since the 2002 Handbook's criteria do not endorse the elimination of Zone 3 even for a low-activity runway, the City's designation of Runway 8 as

a low-activity runway cannot render the City's elimination of Zone 3 consistent with the 2002 Handbook's criteria, which the City is mandated to adopt. Second, the 2002 Handbook's discussion of the modifications that can be made to the criteria for a low-activity runway is plainly aimed at ALUC's that have the expertise to make the discretionary decisions necessary to determine whether such modifications are appropriate. The Legislature intended for ALUC's to have discretion "guided by" the Handbook, but it intended that an affected city in a no-procedure county (that is, the City) have no discretion with respect to the criteria in the Handbook. The 1993 Handbook, which is the only Handbook which was in existence when the Legislature made this decision, did not provide any avenue for modifying the criteria based on the low-activity nature of a runway. Hence, it would defy the Legislature's intent to conclude that the City has discretion to modify the criteria to suit itself based on the City's own determination that a particular runway is a low-activity runway.

Finally, the City's designation of Runway 8 as a low-activity runway is not supported by the City's factual findings. To qualify as a low-activity runway under the 2002 Handbook, a runway must be less than 4,000 feet long and have fewer than 2,000 takeoffs and landings on a runway end. The record is inconclusive with regard to whether Runway 8 is 3,999 feet long or 4,000 feet long. The Airport's current 1998 Federal Aviation Administration-approved airport layout plan (ALP) shows on the diagram that Runway 8-26 is 4,000 feet long, but a chart on the ALP lists Runway 8-26 as being 3,999 feet long. Given this discrepancy, we must accept the City's finding that Runway 8-26 is less than 4,000 feet long. However, the City's finding that Runway 8 is a low-activity runway necessarily rests on its conclusion that Runway 8 has fewer than 2,000 annual takeoffs and landings. This finding is not supported by the record.

The 2003 WAMP found that the Runway 8 end of Runway 8-26 accounted for 5 percent of airport usage and the Runway 26 end accounted for 7 percent of airport usage. The 2003 WAMP also found that annual airport operations in 2000 were 122,890 and were projected to increase to 130,190 by 2010 and 144,503 by 2020. When the City adopted its 2005 resolution amending the 2003 WAMP, the City changed the usage percentages for Runway 8-26 to reflect that the Runway 8 end accounted for only 2 percent of the usage while the Runway 26 end accounted for 10 percent of the usage. The record contains no evidentiary support for this alteration. The City also altered the 2003 WAMP's airport operations and service volume numbers to include footnotes stating: "2004–05 annual demand is approximately 100,000 per Don French, Airport Manager (March 2005)."

The City's 2005 alterations of the 2003 WAMP were clearly designed to permit the City to designate Runway 8 as a low-activity runway. Under the

2003 WAMP, Runway 8 accounted for 5 percent of the Airport's airport operations, which were stated to be 122,890 in 2000 and were forecast to steadily increase. Thus, as of 2000, under the 2003 WAMP, Runway 8 had well over 6,000 airport operations annually, far outside the definition of a low-activity runway in the 2002 Handbook. By amending the 2003 WAMP to change the percentage attributed to Runway 8 to 2 percent and to state that the Airport's total annual airport operations were just 100,000 (a reduction of more than 18 percent from the 2000 number, notwithstanding the 2003 WAMP's projection that airport operations would steadily increase), the City tried to establish that Runway 8 had only 2,000 annual airport operations in 2004–2005.[14] However, even this altered number did not establish that Runway 8 is a low-activity runway within the meaning of the 2002 Handbook. Under the 2002 Handbook, a low-activity runway must have "less than" 2,000 operations per year. Here, Runway 8, even under the City's altered numbers, had 2,000 annual operations in 2004–2005, and the number of airport operations was forecast to increase by more than 15 percent by 2020.[15] Consequently, the City could not have rationally concluded that Runway 8 would qualify as a low-activity runway throughout the life of the 2030 General Plan. It follows that the City could not rely on Runway 8's alleged status as a low-activity runway to support the City's omission from the 2030 General Plan of some of the Handbook's criteria with respect to Runway 8.

The City also maintains that the trial court was precluded from invalidating the 2030 General Plan, even if it properly concluded that the 2030 General Plan violated Public Utilities Code section 21670.1, subdivision (e), because the sole remedy that the court could order was to require the establishment of an ALUC.[16] The City is seemingly relying on Public Utilities Code section 21670.1, subdivision (e)(1)(B)(ii), which provides: "The general and specific plans shall be submitted, upon adoption, to the Division of Aeronautics. If the county and the affected city do not submit the elements specified in paragraph (2) of subdivision (d), on or before May 1, 1996, then a commission shall be established in accordance with this article."

██ Public Utilities Code section 21670.1, subdivision (e)(1)(B)(ii) does not relate to the current circumstances. The City presumably complied with subdivision (e)(1)(B)(ii) "on or before May 1, 1996" by submitting the City's

---

[14] Indeed, the City's FEIR states: "Watsonville Municipal Airport-based aircraft is expected to increase to about 380 with an expected *144,500 landings and takeoffs by year 2020.*" (Italics added.)

[15] The CDOA's "Airport Land Use Coordinator" determined from the Federal Aviation Administration (FAA) that the City had not obtained FAA approval as required for any change in the Airport's "aviation forecast."

[16] The City suggests that the trial court also erred in setting aside its 2005 resolution. As the City provides no substantive support for this contention, we consider it waived.

previous general plan, which contained the required "elements," to the CDOA. Subdivision (e)(1)(B)(ii) has no current application to the City's revised general plan. The adoption of a general plan is a legislative act, and its validity is properly reviewed by a petition for a writ of mandate. (Gov. Code, § 65301.5; *Yost v. Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152].) A legislative act which violates statutory requirements may properly be set aside. (*City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1293–1294 [258 Cal.Rptr. 795].) Because the City is in a county that has not formed an ALUC or established an alternative procedure, Public Utilities Code section 21670.1, subdivision (e) required *the City* to adopt the criteria in the Handbook as part of its general plan. The City did not do so. While it is true that *the County of Santa Cruz* may form an ALUC or possibly adopt an alternative procedure, *the City* is obligated to comply with the statutory duty that falls upon it as a consequence of the county's failure to form an ALUC.[17] It follows that the City must comply with its current obligation to adopt the Handbook's criteria as part of its general plan, as the county currently lacks an ALUC or alternative procedure. Here, the trial court correctly concluded that the City's legislative act of approving the 2030 General Plan violated Public Utilities Code section 21670.1, subdivision (e) and therefore properly ordered the City to set aside its invalid approval.

██ The City also argues that Public Utilities Code section 21679 provides the exclusive remedy for the City's failure to comply with Public Utilities Code section 21670.1, subdivision (e). Public Utilities Code section 21679 provides: "In any county in which there is no airport land use commission or other body designated to assume the responsibilities of an airport land use commission, or in which the commission or other designated body has not adopted an airport land use compatibility plan, an interested party may initiate proceedings in a court of competent jurisdiction to postpone the effective date of a zoning change, a zoning variance, the issuance of a permit, or the adoption of a regulation by a local agency, that directly affects the use of land within one mile of the boundary of a public airport within the county." (Pub. Util. Code, § 21679, subd. (a).) A court may issue an injunction postponing the effective date of the regulation until the local agency takes one of the specified actions. (Pub. Util. Code, § 21679, subds. (b), (c).) Nothing in Public Utilities Code section 21679 reflects that it was intended to preclude a mandate action challenging the validity of a city's general plan due to the city's failure to comply with Public Utilities Code section 21670.1, subdivision (e). The City provides no rational argument to support this contention, and we reject it.

---

[17] The court clearly could not have ordered *the City* to form an ALUC, as that is something only a county can do.

## B. Adequacy of the FEIR

The City contends that the trial court erred in finding that the City had violated CEQA by certifying an FEIR that failed to adequately analyze impacts on aviation and failed to analyze a reasonable range of alternatives.

 The adoption of a general plan is a " '[p]roject' " under CEQA. (CEQA Guidelines, § 15378, subd. (a)(1).) Thus, compliance with CEQA was required before the City could adopt the general plan. An EIR was necessary because there was substantial evidence that the 2030 General Plan might have a significant effect on the environment.[18] (Pub. Resources Code, §§ 21080, subd. (d), 21151, subd. (a); CEQA Guidelines, § 15064, subd. (a)(1).)

"The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR. [¶] (a) An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan or comprehensive zoning ordinance because the effects of the construction can be predicted with greater accuracy. [¶] (b) An EIR on a project such as the adoption or amendment of a comprehensive zoning ordinance or a local general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow." (CEQA Guidelines, § 15146.)

 "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible." (CEQA Guidelines, § 15151.) The EIR must evaluate the environmental impact of a new general plan on the "actual environment" rather than comparing it to the impact of the preexisting general plan. (*Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 354 [182 Cal.Rptr. 317].)

"Judicial review of an agency's decision to certify an EIR and approve a project 'shall extend only to whether there was a prejudicial abuse of

---

[18] " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068; see CEQA Guidelines, § 15382.) " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5; see CEQA Guidelines, § 15360.)

discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.] Thus, we consider only whether the City failed to comply with CEQA or made determinations that were not supported by substantial evidence." (*Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1352 [46 Cal.Rptr.3d 902] (*Preservation Action Council*); see Pub. Resources Code, § 21168.)

### 1. Airport-related Impacts

The trial court found that the FEIR inadequately analyzed "impacts on aviation related to airport safety and noise, the impact of eliminating Zone 3 and revising Zone 6 to allow children's schools, large day care centers, hospitals, and nursing homes[,] . . . improperly deferred analysis of the aviation impacts until specific plans are created later[,] . . . [and] impermissibly relied on the analysis contained in the [airport master plan] EIR."

The City contends that the FEIR "more than adequately analyzed the impacts of the Plan related to Airport noise and safety, properly utilizing the Handbook" in part by incorporating by reference the 2003 WAMP, as amended by the City's 2005 resolution, and the 2003 WAMP's EIR. Friends, Sierra Club, and Pilots assert that the FEIR failed to analyze "the impacts of the deviations from the Handbook" which violate Public Utilities Code section 21670.1, subdivision (e).

"If a lead agency prepares an environmental impact report for a project situated within airport land use compatibility plan boundaries, or, if an airport land use compatibility plan has not been adopted, for a project within two nautical miles of a public airport or public use airport, the Airport Land Use Planning Handbook published by the Division of Aeronautics of the Department of Transportation, in compliance with Section 21674.5 of the Public Utilities Code and other documents, shall be utilized as technical resources to assist in the preparation of the environmental impact report as the report relates to airport-related safety hazards and noise problems." (Pub. Resources Code, § 21096; see CEQA Guidelines, § 15154, subd. (a).)

As the FEIR was for a project that contemplated the development of an area adjacent to a public use airport, and no ALUCP (airport land use compatibility plan) had been adopted, the City was *required* to use the Handbook in preparing those sections of the EIR that addressed "airport-related safety hazards and noise problems."[19]

[19] The FEIR was required to address both airport-related safety hazards and airport-related noise problems. The trial court found that the FEIR failed to adequately address either issue.

The FEIR incorporated by reference the 2003 WAMP, as modified by the City's 2005 resolution, and asserted that the 2003 WAMP "[p]rovide[s] for the development of the Watsonville Municipal Airport consistent with the Master Plan while minimizing adverse effects on adjacent land uses, the local community and the region." The FEIR itself contained a brief statement regarding "Airport Hazards" in which it asserted that the 2003 WAMP addressed this issue. "Safety issues regarding compatibility between airport operations and the surrounding environment include noise impacts, ground safety, and flight hazards. To address these issues, the City has prepared the Airport Master Plan 2001–2020, which focuses on airport safety and noise abatement for future airport operations. The Watsonville Municipal Airport Master Plan is updated every five years to ensure that the airport's development is carried out in a manner that maintains an acceptable level of risk for the airport and its surroundings. In addition, City has an Airport Safety Committee, which meets regularly to address issues of concerns."

The FEIR acknowledged that the Airport has the "[p]otential to create a safety hazard for people residing or working" nearby, but it delegated consideration of those hazards to a future specific plan for the Buena Vista area and asserted that implementation measures and policies would protect adjacent development from airport safety hazards. "The proposed general plan would encourage and facilitate future commercial and industrial development near the Watsonville Municipal Airport. Under the guidance and direction of the proposed general plan, new residential and commercial growth would be directed.to the Buena Vista Area, which is located northeast [*sic*] of the Watsonville Municipal Airport. Portions of Buena Vista would be located within the flight zone of the Airport's west-east flight zone. Development in this area could expose people to potential airport hazards. [¶] To mitigate potential airport hazards, the proposed general plan requires the Buena Vista Specific Plan to consider airport and related land use conflicts and to include designs that reduce land use conflicts and maximize safety. Further, the proposed general plan includes goals, policies, and implementation measures that are designed to protect neighboring development from potential airport hazards through careful land use planning."

The FEIR's airport hazards discussion referenced several of the FEIR's implementation measures.[20] "Implementation 13.1.13 (Industrial Buffer Zones) requires the City to use its development review process to insure that

---

The FEIR's treatment of these two issues was similar. We specifically address only the safety hazards issue, but it should be understood that the FEIR's deficiencies with regard to the noise issue are similar. With regard to noise, the FEIR relied on the 2003 WAMP and its EIR, while the 2003 WAMP and its EIR relied on the City's 2005 general plan and on the City to ensure that any future development will not be impacted by airport noise.

[20] The FEIR also included several other airport-related policies and implementation measures. "Policy 6.7.1 Aviation Facilities. As the only general aviation airport in Santa Cruz

all development proposals within the Airport Operations Impact Area are carefully analyzed to prevent and minimize potential hazards. Further, it states that all projects must be consistent with the City and state guidelines for buildings and land uses near airports. Implementation 13.1.12 requires all areas within the safety sensitive airport operations area to be maintained as open space. The Buena Vista Specific Plan, as well as other areas near the Airport, would be consistent with these goals, policies, and implementation measures. [¶] Therefore, impacts related to airport hazards would be considered less than significant."[21]

Although the FEIR relied heavily on the 2003 WAMP, the 2003 WAMP itself had only a very limited discussion of airport safety as it relates to adjacent land use, and it deferred to future planning by the City the avoidance of airport-related impacts on nearby development. The 2003 WAMP stated: "Specific plans are proposed to control land use in the Buena Vista I, II, III Future Growth Areas, with potential to accommodate in excess of 2,000 new dwelling units, community facilities, parks, school(s), and neighborhood-service commercial." "Buena Vista I, II, and III are designated future growth areas to the north and west of the airport. Attention to compatibility with future development is a given, and part of the specific plan process."

The 2003 WAMP explicitly relied on the general plans of the City and Santa Cruz County to ensure compatible land uses that will avoid airport safety hazards. Under the heading "Land Use Control Strategies," the 2003 WAMP stated: "The primary mechanism for ensuring that the land uses surrounding [the Airport] remain compatible with airport operations is the promulgation of land use compatibility criteria to agencies responsible for regulating land use in the airport environs. The City of Watsonville and the

County, the Watsonville Municipal Airport shall be protected from adjacent development which is incompatible with existing and future services as outlined in the *Airport Master Plan* and Regional Airport System Plan. [¶] Implementation 6.7.11 Cooperative Planning. The County of Santa Cruz and the City shall coordinate land use planning for parcels impacted by airport operations. The City shall encourage the County to revise plans for Pajaro Valley to be consistent with *Watsonville/Vista*. [¶] Implementation 6.7.12 Zoning for Safety. The City shall maintain strict zoning and land use controls within the Airport Operations Impact Area." "Policy 13.1.1 Environmental and Public Safety. The City shall plan for and maintain development standards that minimize risks to human lives and property resulting from environmental and man-caused hazards. The City shall protect neighboring residential development from the immediate threats of potentially hazardous industrial or agricultural materials and airport hazards through careful land use planning."

[21] "Implementation 13.1.13 Airport Compatibility. The City shall use its development review process to ensure that proposals within the Airport Operations Impact Area are carefully analyzed to prevent and minimize potential hazards. Projects shall be consistent with the city and state's guidelines for buildings and land uses compatible with airports. [¶] Implementation 13.1.12 Airport Operation Buffer. Those areas within the safety sensitive airport operations buffer area shall be maintained in open space, which serves agricultural, recreational, alternative transportation, and/or environmental protection needs."

Santa Cruz County, *through their respective general plans* and zoning ordinances, have also adopted specific development standards that regulate and restrict the height of structures and objects and regulate the use of airspace in the vicinity of the airport in accordance with Federal Aviation Regulations, Part 77."[22] (Italics added.)

The 2003 WAMP contained a brief discussion of "Safety Compatibility Zones." "Six safety compatibility zones are incorporated into this Master Plan to regulate land use at [the Airport] and to provide guidance to local jurisdictions and the school district for land use decision[s] in the airport environs." The 2003 WAMP identified the six zones and what it referred to as "generalized compatibility guidelines, as promulgated by [the Handbook] for each safety compatibility zone." The 2003 WAMP's description of the "compatibility guidelines" for Zone 6 omitted any mention of the Handbook's restriction for this zone: "Avoid children's schools, large day care centers, hospitals [and] nursing homes."[23] The 2003 WAMP stated that "Exhibit 13 depicts the location of the six safety compatibility zones for [the Airport]." Exhibit 13 did not depict a Zone 3 for Runway 8. The omission of this zone was not discussed.

The 2003 WAMP's EIR was not any more informative. Notably, this EIR was prepared for the 2003 WAMP and did not address the City's 2005 amendment of the 2003 WAMP. The 2003 WAMP EIR relied on the City's *2005* general plan and contained virtually no discussion of safety concerns for land uses adjacent to the Airport. "By controlling land use and density, and limiting high occupancy structures such as schools, hotels, and hospitals, the surrounding population's exposure to airport noise and accident risk will be minimized. Any changes to [the City's 2005 general plan] are required to be approved by the City Council." This statement assumed that structures will not be built adjacent to the Airport. The only policies and implementation measures in the 2003 WAMP's EIR that were related to airport safety hazards with respect to adjacent land use were the same as the FEIR's airport-related policies and implementation measures.

Neither the 2003 WAMP nor its EIR contained a discussion of the airport-related impacts of the 2030 General Plan, addressed the Handbook's safety criteria or even mentioned that the contemplated development of the Buena Vista area conflicts with the Handbook's safety criteria.

---

[22] This portion of the 2003 WAMP was not changed by the City's 2005 resolution.

[23] The 2003 WAMP's discussion of this issue was followed by this note: "Source: California Airport Land Use Planning Handbook (January 2002), Modified by City Council on April 12, 2005." Before the City amended the 2003 WAMP in 2005, the 2003 WAMP had referred to these "guidelines" as "standards."

The City is left to rely solely on the FEIR's discussion of airport safety criteria in its response to comments. The FEIR's response to comments section contained a discussion of "Air Safety and Land Use Controls" in response to several comments about airport safety. This discussion noted that "the existing safety compatibility zones for Crosswind Runway 8 represented potential conflicts to existing residential development, as well as limitations to the development of areas within Buena Vista I, II and III . . . ." "[W]ithout revision to the Runway 8 safety-compatibility zones, the development potential for the Buena Vista Future Growth Area could be substantially limited . . . ." The City "redesignat[ed]" Runway 8 as "a low activity runway, retaining safety compatibility zones 1, 2, and 4 in their current configuration and eliminating safety compatibility zone 3" because the City "determined that risk exposure for any runway is, in general, greater along the axis extending straight out of the centerline of the runway and greatest at the immediate terminus of the runway." The response claimed that the City's elimination of Zone 3 was "consistent with" the Handbook's "guidelines."

The FEIR's response to these airport safety comments continued. "The [Handbook] provides discretion to the City Council regarding the Airport operations. The Guidelines identify Low Activity General Aviation Runway as an example of a type of runway that can be considered when addressing local airport conditions and safety compatibility zones designations. The City determined that the activity on Runway 8 was low (representing just 2% of annual flights) and that the activity was driven by meteorological conditions unique to Watsonville and the Central Coast. The City further determined that risk exposure for any runway is greatest at the immediate terminus of the runway, but remains greater along an axis extending straight out from the centerline of the runway. The City understands that the [Handbook] provides 'general guidance' to the City. Based on these factors, the City approved the re-designation of Runway 8 to Low-Activity and the removal of Safety Compatibility Zone 3." Although the response mentioned Zone 6, it said nothing about the fact that the City modified Zone 6 with respect to Runway 8 to delete Zone 6's "Avoid" restrictions.

The FEIR contained no discussion of the deletion of the restrictions in Zone 6. Its discussion of the City's elimination of Zone 3 amounted to these assertions: (1) deletion of Zone 3 was necessary in order to permit development of the Buena Vista area; (2) the deletion of Zone 3 was "consistent with" the Handbook, which contained only discretionary guidelines; and (3) Zone 3 was unnecessary because it did not cover the area where the "risk exposure" was "greatest." We agree with the trial court that this discussion is inadequate. First, there is no discussion of the Zone 6 modification. Second, it is not true that the Handbook's criteria are merely discretionary guidelines; they are mandatory as to the City. Third, the deletion of Zone 3 and modification of Zone 6 were not "consistent with" the Handbook's criteria, as

we have already discussed. Finally, the FEIR's claim that Zone 3 was unnecessary because it did not cover the area where the risk was greatest is inconsistent with the nature of the different safety compatibility zones. The level of risk in each zone is related to the nature of the restrictions. Zone 3 does not have the highest level of risk, but it also does not have the highest level of restrictions. The mere fact that Zone 3 does not cover the area of greatest risk does not mean that the level of risk in Zone 3 does not merit the restrictions set forth in the Handbook.

We agree with the trial court that the City violated CEQA because the FEIR failed to adequately analyze the airport-related impacts of the 2030 General Plan.

## 2. Range of Alternatives

The trial court found that the FEIR failed to "consider and evaluate a reasonable range of alternatives" because it did not "consider and evaluate a reduced development alternative." The City contends that the trial court erred because the FEIR was not required to evaluate a reduced development alternative as that would have been inconsistent with the City's general plan objective of "accommodat[ing] projected growth." Alternatively, the City claims that the FEIR *did* evaluate a reduced development alternative in the form of the "no-project" alternative, which the City asserts would have resulted in about half as much development.

 " 'CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose.' " (*Preservation Action Council, supra*, 141 Cal.App.4th at p. 1350.) "An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation. An EIR is not required to consider alternatives which are infeasible. The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives. There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (CEQA Guidelines, § 15126.6, subd. (a).)

 "Because an EIR must identify ways to mitigate or avoid the significant effects that a project may have on the environment (Public

Resources Code Section 21002.1), the discussion of alternatives shall focus on alternatives to the project or its location which are capable of avoiding or substantially lessening any significant effects of the project, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly." (CEQA Guidelines, § 15126.6, subd. (b).) While the lead agency may ultimately determine that the potentially feasible alternatives are not actually feasible due to other considerations, the actual infeasibility of a potential alternative does not preclude the inclusion of that alternative among the reasonable range of alternatives. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 981, 999–1000 [99 Cal.Rptr.3d 572] (maj. opn.); *id.* at pp. 1006–1007 (conc. opn. of Mihara, Acting P. J.); *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 489 [14 Cal.Rptr.3d 308] (*Mira Mar*).)

■ The question of whether the FEIR was required to discuss a reduced development alternative depends on whether a reduced development alternative would have been "capable of avoiding or substantially lessening any significant effects of the project," even if it "would impede to some degree the attainment of the project objectives." (CEQA Guidelines, § 15126.6, subd. (b).) The City's argument on this issue is premised on its claim that no discussion of an alternative is required if that alternative would not meet a project objective. This premise is mistaken. It is virtually a given that the alternatives to a project will not attain *all* of the project's objectives. (Cf. *California Native Plant Society v. City of Santa Cruz, supra*, 177 Cal.App.4th at p. 991 (maj. opn.); *id.* at pp. 1005–1006 (conc. opn. of Mihara, Acting P. J.); *Mira Mar, supra*, 119 Cal.App.4th at p. 489.) Nevertheless, an EIR is required to consider those alternatives that will "attain most of the basic objectives" while avoiding or substantially reducing the environmental impacts of the project. (CEQA Guidelines, § 15126.6, subd. (a).)

The FEIR identified a dozen objectives for the City's new general plan: (1) "Update the City's environmental baseline conditions to the year 2006"; (2) "Addition of new goals and policies based upon the new planning factors established for the proposed general plan"; (3) "Update the general plan development projections for the year 2030, including projections for dwelling units and employment, consistent with AMBAG projections"; (4) "Conform with Section 21000 et. seq. of CEQA, which requires that environmental impacts be addressed and mitigated"; (5) "Prepare and certify a proposed general plan EIR (Program EIR) that will serve as a first tier environmental document, consistent with the requirement of Section 15152 of the CEQA Guidelines"; (6) "Promote more efficient land development"; (7) "Better preserve agricultural uses within the planning area based on a long-term planning strategy"; (8) "Accommodate future demand for housing and employment"; (9) "Address changed conditions since the adoption of

Watsonville 2005 general plan in 1995"; (10) "Develop a land use mix that better supports alternatives to the automobile"; (11) "Provide a basis for informative decisions when considering the development associated with implementation of proposed general plan"; and (12) "Provide a legally defensible environmental foundation upon which decisions may be evaluated and justified."

At most, two of these 12 objectives would not have been fully satisfied by a reduced development alternative. A reduced development alternative would not have "[a]ccommodate[d] future demand for housing and employment" "consistent with AMBAG projections." Such an alternative would have only partially satisfied these two objectives by accommodating some of the future demand that AMBAG (the Association of Monterey Bay Area Governments) projected. Yet a reduced development alternative could have fully satisfied all of the other objectives identified by the City. We reject the City's claim that the FEIR could omit consideration of a reduced development alternative simply because such an alternative would not fully satisfy each and every one of the City's objectives.

The City contends that, even if a reduced development alternative did merit consideration in the FEIR's alternatives analysis, the FEIR adequately addressed a reduced development alternative by considering the "no-project" alternative.

The FEIR concluded that the 2030 General Plan "would result in significant and unavoidable impacts" on (1) "Housing and Population—Potential for substantial population growth from development"; (2) "Agriculture—Conversion of farmland"; (3) "Water Resources—Continued overdraft of groundwater"; and (4) "Public Facilities and Services—Continued overdraft of groundwater."

The FEIR considered three alternatives to the 2030 General Plan. "Alternative 1" would have the same level of development, but all new development would be within the existing city limits. "Alternative 2" would have the same level of development, but only half of the new development would be in the future growth areas and the other half would be within the existing city limits. "Alternative 3" was the "no-project" alternative. It would have about half the total level of development with almost all of it in the future growth areas.

The FEIR compared these three alternatives to the 2030 General Plan and concluded that Alternative 3 would reduce to less than significant the impact

on population growth while Alternative 1 would reduce to less than significant the impact on farmland conversion.[24] All three alternatives would have less impact on depletion of groundwater and the water supply than the 2030 General Plan, with Alternative 3 having only half as much impact on water demand.

The FEIR's description of Alternative 3 assumed that 2,250 new dwelling units would be built in the Buena Vista area, and 600 new dwelling units would be built in the Atkinson Lane area over the next 20 to 25 years. These figures were identical to the number of dwelling units contemplated by the 2030 general plan. The FEIR stated that, because Alternative 3 would continue development under the 2005 general plan as amended by Measure U (which had established an urban limit line), the City would lack the ability to promote and encourage in-fill development, so in-fill development would account for only 168 dwelling units.

■■■ The City's contention that the FEIR's consideration of Alternative 3, the "no-project" alternative, constituted sufficient consideration of a reduced development alternative ignores the purposes of an EIR's alternatives analysis. "The core of an EIR is the mitigation and alternatives sections. . . . 'The purpose of an environmental impact report is to identify the significant effects of a project on the environment, *to identify alternatives to the project*, and to indicate the manner in which those significant effects can be mitigated or avoided.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 554 [276 Cal.Rptr. 410, 801 P.2d 1161].) The purpose of an EIR is *not* to identify alleged alternatives that meet few if any of the project's objectives so that these alleged alternatives may be readily eliminated. Since the purpose of an alternatives analysis is to allow the decision maker to determine whether there is an environmentally superior alternative that will meet most of the project's objectives, the key to the selection of the range of alternatives is to identify alternatives that meet most of the project's objectives but have a reduced level of environmental impacts.

Here, the environmental impacts of the project were primarily due to the impacts of growth itself. The 2030 General Plan contemplated the development of many more dwelling units in the City. This development would increase the population of the City, convert prime farmland to residential housing, and put further stress on an already overburdened water supply to meet the demand created by the population that would live in these new

---

[24] The FEIR asserted that Alternatives 2 and 3 would have the same impact on the conversion of "Prime Farmland" to nonagricultural uses. As to Alternative 2, the FEIR implicitly assumed that the same amount of acreage would be utilized for development in the future growth areas even if only half as much development occurred. The basis for this assumption is unexplained.

dwelling units. Given these significant environmental impacts of the project, the alternatives analysis should have included an assessment of a reduced growth alternative that would meet most of the objectives of the project but would avoid or lessen these significant environmental impacts. Because Alternative 3, the "no-project" alternative, would not create *any* plan for the future, it would meet *almost none* of the project's objectives. As a result, it did not serve the purpose that a reduced development alternative should have served. The administrative record provides no justification for the FEIR's failure to include within its alternatives analysis a reduced development alternative that would have satisfied the 10 objectives of the project that did not require the level of development contemplated by the project. Analysis of such an alternative would have provided the decision makers with information about how most of the project's objectives could be satisfied without the level of environmental impacts that would flow from the project.

 Accordingly, we agree with the trial court that the City violated CEQA because the FEIR failed to analyze a reduced development alternative.

## IV. The Cross-appeal

Pilots and Sierra Club contend that the City violated CEQA because the FEIR did not adequately analyze the environmental impacts of supplying water to the development contemplated by the 2030 General Plan.

 Pilots and Sierra Club rely on the California Supreme Court's decision in *Vineyard, supra,* 40 Cal.4th 412. *Vineyard* concerned a community plan and a specific plan for a large mixed-use development. (*Vineyard,* at p. 421.) The specific plan, which applied to about half of the community plan, proposed the construction of nearly 10,000 dwelling units. (*Vineyard,* at p. 422.) The California Supreme Court held that the unified EIR for the community and specific plans was inadequate because it failed to explain how long-term water demand could be satisfied from the sources it identified, and failed to discuss the environmental impact of utilizing these sources. (*Vineyard,* at p. 421.) "[T]he burden of identifying likely water sources for a project varies with the stage of project approval involved; the necessary degree of confidence involved for approval of a conceptual plan is much lower than for issuance of building permits. The ultimate question under CEQA, moreover, is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project. If the uncertainties inherent in long-term land use and water planning make it impossible to confidently identify the future water sources, an EIR may satisfy CEQA if it acknowledges the degree of uncertainty involved, discusses the reasonably foreseeable alternatives— including alternative water sources and the option of curtailing the development if sufficient water is not available for later phases—and discloses the

significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact." (*Vineyard*, at p. 434.)

Pilots and Sierra Club assert that the FEIR failed to adequately "[d]isclose and [d]iscuss" both the "[u]ncertainties" regarding the conservation measures and the underlying basis for the FEIR's conclusion that the conversion of agricultural land to urban use would offset the increased demand for water created by the new development contemplated by the 2030 General Plan.

The City's groundwater supply comes from the Aromas Red Sands geologic unit, which is part of the Pajaro Valley groundwater basin (the Basin). The Basin has been in overdraft (extractions exceeding recharge) for decades. Nevertheless, the Basin's storage capacity is estimated at 2,000,000 acre-feet, and this level of storage has fallen by only 300,000 acre-feet over several decades. Due to the composition of the subsurface soils, the areas within the City's urban limit line are not the primary sources of groundwater recharge. Urban extractions account for about 15 percent of all extractions from the Basin, while agricultural extractions account for about 77 percent of total extractions. Overdraft has caused seawater intrusion into the Basin, but the seawater intrusion has not yet reached the City's active production wells due to the inland location of these wells.

The "sustainable yield" from the Basin is just 24,000 acre-feet per year (AFY) "under current groundwater pumping practices" while actual usage is 69,000 AFY, with a resulting overdraft of 45,000 AFY. The FEIR contained considerable discussion of how this overdraft may be addressed. "Groundwater modeling indicates that the elimination of pumping along the coast would reduce seawater intrusion more efficiently than a reduction in pumping throughout the basin. This change in pumping practice is estimated to double the basin sustainable yield (48,000 AFY) [fn. omitted] and reduce basin overdraft to approximately 21,000 AFY." Coastal pumping could be eliminated if a coastal distribution system (CDS) was constructed. A CDS would require 25 to 30 miles of pipeline to be built to serve 200 agricultural parcels. There would still, of course, be a considerable overdraft to address. The FEIR noted that the Pajaro Valley Water Management Agency (PVWMA) is working to acquire a substantial quantity of water from the Central Valley Project which it could import through a pipeline that would connect to the CDS. This imported water would substantially alleviate the overdraft situation.

The FEIR also discussed the City's conservation policies and implementation measures that would help to offset the increased water demand from the new development contemplated by the 2030 General Plan. These policies and measures required the City to "promote the conservation of water," "continue

to implement its water use reduction program," "adopt a Water Demand Offset Ordinance," "cooperate with the Pajaro Valley Water Management Agency (PVWMA) in its efforts to secure a reliable long-term supply of water," "work cooperatively with PVWMA to construct a water recycling facility adjacent to the City's wastewater treatment plant, to provide a new source of water for agricultural use," and "work with PVWMA to educate and create incentives for measures targeting private water users, including: water-efficient plumbing fixtures and faucets, reducing use of lawns and other water-intensive plants, encouraging drought-tolerant native plants and 'xeriscapes,' mulching to retain soil moisture, and using water-efficient irrigation systems." The City's water demand offset ordinance would require new development to have " 'zero impact' " on water usage. "This ordinance shall require applicants for new water service to offset at least the amount of water the new development is projected to use so that there is a 'zero impact' on the City's water supply. Applicants for new service could accomplish the offset requirements by paying for water conservation measures such as low-flow fixture retrofits or synthetic turf retrofits for existing customers within City limits." The anticipated closure of high water use food-processing plants in the City and the 2030 General Plan's proposed conversion of agricultural lands to urban uses would also serve to offset the increased demand.

 The FEIR's discussion of the overdraft situation, and its analysis of the steps that the City would take to address this situation satisfy the standard set forth by the California Supreme Court in *Vineyard*. It is not necessary for an EIR for a general plan to establish a "likely source of water." Such a "conceptual" EIR need only "adequately address[] the reasonably foreseeable *impacts* of supplying water to the project," note any uncertainties that preclude the identification of future water sources, and discuss "the reasonably foreseeable alternatives" and environmental impacts of those alternatives. (*Vineyard, supra,* 40 Cal.4th at p. 434.) Here, the FEIR did identify the likely source of water for the new development: the Basin's groundwater. It also noted the uncertainties surrounding the Basin's overdraft condition and discussed the various measures that the City and PVWMA were undertaking to address the long-term overdraft situation in the foreseeable future. Because the FEIR concluded that the water demand from the new development would be offset by conservation, conversion of agricultural lands to urban use, and other measures, the FEIR concluded that the 2030 General Plan would not significantly worsen the overdraft situation.

Pilots and Sierra Club challenge the FEIR's conclusion that the new development's water demand will be offset by conservation measures and the conversion of agricultural land to urban use. Their challenge is primarily based on a mathematical attack on the calculations that the FEIR utilized to support its conclusion that the conversion of agricultural lands to urban use

would substantially offset the increased demand for water from the new development contemplated by the 2030 General Plan.

The FEIR stated that its calculations were based on "numbers" "obtained from PVWMA." It identified the AFY per acre for each crop type in the affected areas. Most of the affected agricultural land used 2.8 AFY per acre to grow strawberries. In the Buena Vista area, however, a portion of the land was devoted to orchards, which used .9 AFY per acre, and another portion of the land grew raspberries, which used 3.7 AFY per acre. The FEIR stated that approximately 330 acres of farmland would be converted to urban usage under the 2030 General Plan. The FEIR also stated that the City's 2005 population was 56,200, its projected 2030 population will be 70,418 under the 2030 General Plan, and the City's population used 5,306 AFY of water in 2005.

Utilization of these figures from the FEIR supports the FEIR's conclusion that conversion of farmland will substantially offset the increased water demand created by the development contemplated by the 2030 General Plan. If 56,200 persons used 5,306 AFY in 2005, each person used approximately 0.094 AFY.[25] If individual water usage remained constant, the City's projected 2030 population of 70,418 would use 6,619 AFY, an increase of 1,313 AFY over the City's 2005 water usage. The FEIR described in detail how the conversion of farmland would offset this increased water demand. The conversion of 182 acres of agricultural land in the Buena Vista area would result in a decrease of 392 AFY in agricultural water demand. Other post-2005 conversions of agricultural land in the City to urban use would push the total decrease in water demand to 1,134 AFY. When this decrease is offset against the projected increase, the net increase amounts to just 179 AFY. Because the FEIR contained sufficient support for its conclusion, the mathematical assault by Pilots and Sierra Club fails.

Pilots and Sierra Club also attack the FEIR's projection that conservation and other measures will decrease water usage. They claim that there is "no data or explanation" of how these measures will achieve this goal. The FEIR posited that numerous city-promoted conservation measures could reduce water usage by 1,000 AFY, and the closure of food-processing plants in the City could reduce water usage by "as much as" 1,000 AFY.[26] While the FEIR did not attempt to predict with precision exactly how much each water conservation measure would reduce water usage, the detail provided about the nature of these measures and the uncertainties inherent in such long-term

---

[25] Although the DEIR used a factor of .25 AFY per dwelling unit, this information was deleted from the FEIR, which did not specify how urban usage levels were determined.

[26] The FEIR also mentioned conservation plans within the entire PVWMA area that could save up to 4,500 AFY through agricultural conservation.

forecasts provide adequate support for the FEIR's predictions, particularly in light of the FEIR's detailed calculations supporting its conclusion that most of the increased water usage associated with the new development would be offset by conversion of farmland. Even if the City's conservation efforts do not produce the hoped-for 1,000 AFY reduction in usage, the FEIR could reasonably conclude that the new development's increased water usage that is not offset by the conversion of farmland would be offset by even a modest reduction in usage attributable to the City's conservation efforts.

Pilots and Sierra Club also take issue with the FEIR's failure to pinpoint a solution to the overdraft problem. The purpose of an EIR is to identify and discuss the impact of the proposed project on the existing environment. The FEIR concludes that the impact of the new development contemplated by the 2030 General Plan will be offset by decreased water usage associated with the conversion of farmland and the City's water conservation measures. Thus, the overdraft problem will remain but will not be exacerbated by the proposed project. The FEIR was not required to resolve the overdraft problem, a feat that was far beyond its scope.

The final contention made by Pilots and Sierra Club is that the FEIR is deficient because it fails to discuss PVWMA's potential inability to provide funding for its collaborative projects with the City. The speculative possibility that PVWMA might encounter future difficulties in financing various water supply projects was not necessary to the validity of any of the FEIR's conclusions. PVWMA's water supply projects were discussed in the FEIR as efforts that were anticipated to be made to help resolve the long-term overdraft problem.[27] Yet the FEIR was not tasked with proposing solutions to the overdraft problem, and its conclusions remained valid regardless of whether PVWMA was likely to resolve the overdraft problem in the foreseeable future. Speculation about PVWMA's possible future funding problems was not necessary to support the FEIR's analysis of the impact of the 2030 General Plan on the existing environment, one in which, as the FEIR acknowledged, the long-term overdraft problem will continue to be a concern regardless of the 2030 General Plan.

Like the trial court, we do not find the FEIR's analysis of the impact of the 2030 General Plan on the water supply to be inadequate.

---

[27] The FEIR identified two possible future water supply projects. The first of these would supply additional surface water. The FEIR asserted that improvements to the Corralitos Filter Plant could allow that plant to utilize "currently untapped high winter creek flows." The second possible future water supply project was described as a collaboration with PVWMA to construct a new water recycling facility. The FEIR stated that the City and PVWMA have "secured grant funding for this facility, which is expected to be completed by 2007 and provide 4,000 AFY to local farmers for crop irrigation. In addition, as coastal agricultural lands would use this water, the facility is anticipated to help reduce groundwater overdraft conditions."

## V. Disposition

The judgment is affirmed.

Elia, Acting P. J., and McAdams, J., concurred.