[No. D042070. Fourth Dist., Div. One. May 17, 2004.]

MIRA MAR MOBILE COMMUNITY et al., Plaintiffs and Appellants, v. CITY OF OCEANSIDE et al., Defendants, CH OCEANSIDE Real Party in Interest and Respondent.

480

## COUNSEL

Worden, Williams, Richmond, Brechtel & Kilpatrick, Terry Kilpatrick and D. Wayne Brechtel for Plaintiffs and Appellants.

Anita Willis, City Attorney, and Pamela J. Walls, Assistant City Attorney, for Defendants.

Luce Forward; Hamilton & Scripps, Ronald W. Rouse and Brian C. Fish for Real Party in Interest and Respondent.

## OPINION

**McINTYRE, J.**—In this action brought under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), Mira Mar Mobile Community (Mira Mar) and Logan Boggs (together plaintiffs) appeal a judgment denying their petition for writ of mandate challenging the certification of an environmental impact report (EIR) for a proposed development project known as the Renaissance Terrace Condominiums (the project). (All undesignated statutory references are to the Public Resources Code.)

Plaintiffs contend that the decision by the Oceanside Community Development Commission (CDC) and the City of Oceanside (together, the City) to certify the EIR violated CEQA because the report (1) did not identify feasible

project alternatives; (2) inadequately analyzed the project's impact on their property; (3) inadequately mitigated the significant biological effects of the project on coastal sage scrub; and (4) contained inadequate findings. For the reasons set forth below, we affirm the judgment denying the writ.

## FACTUAL AND PROCEDURAL BACKGROUND

The project is a planned 96-unit condominium development to be constructed on 7.5 acres of private property located within the City's Downtown Redevelopment Project Area. The land is currently vacant, but its past uses included a railroad spur track alignment and grading done in connection with the construction of Interstate 5. As a result of these prior uses, the upper eastern portion of the property is disturbed, developed or covered with non-native vegetation. The lower portion of the property adjacent to the San Luis Rey River (the river) is less disturbed and supports native vegetation. The project is contiguous with and immediately north of Mira Mar, a 173-unit mobile home community, owned by Boggs.

In 1975, the City adopted a redevelopment plan for its downtown area and certified an EIR for it. In 1978, the City amended the redevelopment plan to divide the area into 13 development districts and certified a Subsequent Master Environmental Impact Report (MEIR). The City amended the redevelopment plan again in 1981 and adopted a Final Supplemental Environmental Impact Report (Plan EIR) for proposed amendments to the redevelopment plan and the City's general plan. In 1992, the City further amended the redevelopment plan to identify 15 development subdistricts. In the subdistrict where all of the project's residential structures will be built, the redevelopment plan authorizes high-density residential development of 29–43 dwelling units per acre, with allowable building heights of 45–65 feet depending on site coverage.

The project will have a net density of 28.3 units per acre and will consist of two buildings with underground parking separated by an unobstructed view corridor between the buildings. The project impacts a total of 4.36 acres, consisting of 3.72 acres for on-site development and 0.64 acres for off-site infrastructure. While the height of the project's buildings range from 45 to 65 feet above grade, the maximum height of the project, when viewed from the grade of the plaintiffs' property, is equivalent to a two-to three-story building.

The City approved the project in May 2002, by adopting a resolution that certified the Final Supplemental Environmental Impact Report (Final SEIR) for the project. The Final SEIR incorporated the draft Final SEIR and associated appendices and technical appendices. A companion resolution

approved the tentative map and other substantive permits and entitlements required by the City's redevelopment plan. Plaintiffs filed this action challenging the City's approval of the project and the Final SEIR. The trial court entered judgment in favor of the City and plaintiffs appeal.

## DISCUSSION

### I

### EIR Standard of Review

In a mandate proceeding to review an agency's decision for compliance with CEQA, we review the administrative record de novo (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375–1376 [43 Cal.Rptr.2d 170]), focusing on the adequacy and completeness of the EIR and whether it reflects a good faith effort at full disclosure. (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 954 [91 Cal.Rptr.2d 66].) Our role is to determine whether the challenged EIR is sufficient as an information document, not whether its ultimate conclusions are correct. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 407 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta II*).)

An EIR is presumed adequate (§ 21167.3, subd. (a)) and we review an agency's action under CEQA for a prejudicial abuse of discretion. (§ 21168.5.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Under CEQA, substantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made . . . is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion[,] narrative [or] evidence which is clearly erroneous or inaccurate . . . does not constitute substantial evidence." (Cal. Code Regs., tit. 14, § 15384, subd. (a); all references to the CEQA Guidelines refer to title 14 of the California Code of Regulations.) In applying the substantial evidence standard, we resolve all reasonable doubts in favor of the administrative finding and decision. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393.)

## II

### Adequacy of the EIR

A. *The Final SEIR Adequately Analyzed a Reasonable Range of Project Alternatives*

■ It is a fundamental statutory policy of this state that public agencies will "consider alternatives to proposed actions affecting the environment" prior to approving such actions. (§ 21001, subd. (g); *Laurel Heights, supra,* 47 Cal.3d at p. 400.) To implement this policy, CEQA requires that an EIR identify feasible alternatives that could substantially lessen the significant environmental impacts of a project. (§§ 21002, 21002.1, subd. (a), 21100, subd. (b)(4).) For purposes of CEQA review, "feasible" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; CEQA Guidelines, § 15364.)

■ The CEQA Guidelines further specify that an EIR must "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives," focusing on alternatives that would "avoid[] or substantially lessen[] any significant effects of the project, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly." (CEQA Guidelines, § 15126.6, subds. (a) & (b).) The discussion of alternatives is subject to a rule of reason (*id.* at subd. (a)) and the scope of alternatives to be analyzed must be evaluated on the facts of each case and in light of the statutory purpose. (*Goleta II, supra,* 52 Cal.3d at p. 566.)

■ CEQA mandates the use of tiered EIR's where, as here, a project encompasses a wide spectrum of activities ranging from adoption of a general plan to specific projects. (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618].) " 'Tiering' refers to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared." (CEQA Guidelines, § 15385.) Because this project is part of a much broader redevelopment scheme, it is necessary to examine the underlying plans, policies and zoning to evaluate whether the City analyzed a reasonable range of alternatives.

The City adopted a redevelopment plan that set forth redevelopment boundaries and created a process and a basic framework for launching specific projects in the redevelopment area. The MEIR considered alternatives, including alternative district boundaries. The Final SEIR incorporated these earlier reports by reference and presented supplemental information regarding the project. The project at issue falls within the redevelopment area, with all structures to be built in a zoning subdistrict designated for single-family and multi-family residential use at 29–43 dwelling units per acre with structures up to 65 feet above existing grade. Other, smaller portions of the project area lie within zoning districts designated for open space or mixed residential and commercial use.

The Final SEIR analyzed a "no project" alternative and three other alternatives that conformed to the designated zoning, including two single-family residential developments and a single-structure, multi-residential development. Plaintiffs contend the four alternatives described in the Final SEIR do not satisfy CEQA's requirements that an EIR meet basic project objectives and avoid or substantially reduce the project's environmental alternatives. They argue the alternatives did not comply with CEQA because they were not feasible. They also contend the Final SEIR was inadequate because it failed to review alternative sites. While the alternatives discussion is far from perfect, we conclude any error was not prejudicial. (§ 21005, subd. (b).)

■ CEQA requires that the Final SEIR analyze a "no project" alternative. (CEQA Guidelines, § 15126.6, subd. (e).) Where, as here, this alternative means a proposed project would not proceed, the discussion "[sh]ould compare the environmental effects of the property remaining in its existing state against environmental effects which would occur if the project is approved. " (*Id.* at subd. (e)(3)(B).) Plaintiffs claim the Final SEIR's analysis of this alternative is misleading because it fails to indicate that the project would result in a loss of open space and coastal sage scrub. However, other parts of the Final SEIR addressed the loss of open space and coastal sage scrub from the project and the impact of the no project alternative on these two issues is self-evident. The draft Final SEIR points out that the land would remain "undeveloped," resulting in no impacts on biological resources, and the failure of the Final SEIR to discuss the obvious is not fatal. Plaintiffs also contend that the Final SEIR improperly speculates that if this project does not go forward, future proposals for the site could result in a greater impact. However, this comment merely acknowledges the reality that a disapproval of the instant project would inevitably result in the proposal of some other project. (CEQA Guidelines, § 15126.6, subd. (e)(3)(B).)

"The purpose of describing and analyzing a no project alternative is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project." (CEQA Guidelines, § 15126.6, subd. (e)(1).) Here, the draft Final SEIR properly indicates that the proposed project benefits the environment by restoring disturbed coastal sage scrub and maintaining and managing all of the coastal sage scrub habitat in perpetuity. Additionally, the project helps eliminate urban storm water pollutants from reaching the river. In this regard, the draft Final SEIR indicates that storm water runoff from the project, Mira Mar, area commercial establishments and a vacant lot would be routed to a proposed detention basin to percolate to the groundwater through the basin's earthen bottom and sides. The design also includes an in-line storm water treatment unit that would capture material pollutants for periodic removal. The discussion of the no project alternative satisfied CEQA because it allowed decision makers to compare the environmental impacts of the project with the impacts of no project.

In addition to a no project alternative, the Final SEIR analyzed two reduced density alternatives, consisting of 28 single-family lots with a community pool and recreation area and the second consisting of 10 single-family lots. Plaintiffs criticize the discussion of these low-density alternatives, essentially arguing these alternatives should not have been included because the City ultimately rejected them as not feasible.

Admittedly, the primary objective of the project is to provide high-density housing consistent with existing planning goals; however, other objectives include developing a vacant area that is highly visible and historically disturbed in a manner that is sensitive to surrounding developments, the natural habitat and open space associated with the river, thereby providing a valuable addition to the downtown area. While these alternatives do not meet the primary development objective of providing high-density housing, they do satisfy all the secondary project objectives. This is sufficient because alternatives need not satisfy all project objections, they must merely meet "most" of them. (CEQA Guidelines, § 15126.6, subd. (a).)

Although the City ultimately rejected these alternatives as "infeasible," this conclusion does not imply these alternatives were improperly included for discussion. Alternatives included in an EIR need only be "potentially feasible" (CEQA Guidelines, § 15126.6, subd. (a)), meaning they are "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.)

▇ Additionally, the only significant adverse environmental impact identified in connection with the project was a loss of sensitive coastal sage scrub habitat. Once the City found this adverse impact could be avoided or substantially lessened by mitigation measures, it was not required to make any findings regarding the feasibility of proposed alternatives. (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 379 [7 Cal.Rptr.2d 307], citing *Laurel Heights, supra,* 47 Cal.3d at p. 402 [253 Cal.Rptr. 426, 764 P.2d 278] and *Laurel Hills Homeowners Assn. v. City Council* (1978) 83 Cal.App.3d 515, 521 [147 Cal.Rptr. 842].) As discussed *post* at part II.C, we reject plaintiffs' assertion that the mitigation measures for the impacted coastal sage scrub are insufficient.

Plaintiffs also argue these alternatives were inappropriate because the alternatives did not reduce significant impacts. However, the 10 single-family lot alternative eliminated all adverse impacts to biological resources, including coastal sage scrub, and offered other benefits including an 80 percent decrease in traffic with a concomitant benefit to air quality. The 28 single-family lot alternative also decreased the amount of traffic generated by about one-half, thereby causing less of an impact on air quality, and decreased the amount of grading required by eliminating the need for underground parking. The 28-lot alternative would also encroach into open space to construct the recreation facility; however, there was no indication of how this encroachment would impact the coastal sage scrub.

The Final SEIR also examined an alternative that would place 95 luxury condominiums on the same development "footprint," but in a single structure that would satisfy the project's primary objective of providing high-density housing. However, as argued by plaintiffs, this alternative had all the same environmental impacts as the proposed project and admittedly worse impacts on aesthetics from public viewing areas. While we do not condone the City's inclusion of an alternative that does not further CEQA's purposes, we find the error was not prejudicial. (§ 21005, subd. (b).)

Plaintiffs suggest the City should have considered alternative designs that were less damaging to the environment and their private views; however, other information contained in the record—particularly, maps of the project site—reveal that the location and design of the project struck a balance between meeting redevelopment goals and maintaining the natural habitat. The project was modified during the public review period by placing the buildings as far away from a floodplain as possible, while maintaining the appropriate setback distance from property lines. Additionally, regulations limit the height of buildings to 45 feet since they will be located within 50 feet of the 100-year floodplain boundary. Relocating any large structures to

another area of the property would place the structures outside the subdistrict zoned for housing, over a delineated floodplain setback and into the only area on the project site with undisturbed coastal sage scrub.

■ The Final SEIR's alternatives discussion, while not perfect, satisfied CEQA because it allowed decisionmakers and the public to evaluate the comparative merits of the proposed project with two low-density and one high-density alternatives on an impact-by-impact basis in eight environmental categories. (CEQA Guidelines, § 15126.6, subd. (d).) Anyone reviewing this discussion and accompanying maps could quickly ascertain that any alternative, other than an extremely low-density proposal such as the 10-lot alternative, would encroach upon coastal sage scrub. Simply put, any possible low-density or high-density housing alternative would encounter with the same problems and CEQA does not require an EIR to consider "each and every conceivable variation of the alternatives stated." (*Residents Ad Hoc Stadium Com. v. Board of Trustees* (1979) 89 Cal.App.3d 274, 287–288 [152 Cal.Rptr. 585].) Given the constraints of the property and the fact the proposed project has only one significant environmental impact, we conclude that the discussion of alternatives did not preclude informed decisionmaking or informed public participation and thus did not constitute a prejudicial abuse of discretion. (§ 21005, subd. (b).)

■ Finally, we disagree with plaintiffs' contention that the alternative analysis was insufficient because the Final SEIR failed to address any off-site alternatives. Although CEQA requires that an EIR identify alternatives to a project, it does not expressly require a discussion of alternative project locations. (§§ 21001, subd. (g), 21002.1, subd. (a), 21061.) The CEQA Guidelines require a description of "a range of reasonable alternatives to the project, or to the location of the project," implying that an agency may evaluate on-site alternatives, off-site alternatives, or both. (CEQA Guidelines, § 15126.6, subd. (a).) There is a paucity of case law addressing when off-site alternatives must be discussed. In *Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167 [243 Cal.Rptr. 339], the court indicated that the particular situation should be examined to determine whether the availability of other feasible sites must be considered in an EIR because "what is reasonable in one case may be unreasonable in another." (*Id.* at p. 1179.)

■ In *Goleta II*, our high court discussed the importance of long-term comprehensive land use planning, noting that the long-term planning process necessarily compels the consideration of alternative "land-use goals, policies and implementation measures." (*Goleta II, supra,* 52 Cal.3d at p. 571.) Because of this "an EIR is not ordinarily an occasion for the reconsideration or overhaul of fundamental land use policy." (*Id.* at p. 573.) Here, the local

coastal program (see § 30500 et seq.) included a section on alternative land uses and the Plan EIR addressed alternatives to redevelopment, including alternative redevelopment boundaries and an inventory describing the various districts. Thus, the public had ample opportunity to review and comment on the particular use of the land for high-density residential development and the fact such a development was proposed should not prompt reconsideration of existing planning policies in the Final SEIR. (*Goleta II, supra*, 52 Cal.3d at p. 573 ["reconsideration of regional land-use policies, in the context of a project-specific EIR, is the very antithesis of [long-term comprehensive planning]"].) ■ Because the proposed project is consistent with the City's existing plans, policies and zoning, we conclude a review of alternative sites was not necessary.

B. *The Final SEIR Adequately Analyzed the Project's Impact on Plaintiffs' Property*

During the public comment period, Boggs wrote a letter representing that the project would completely block the ocean view, the sun and the ocean breezes enjoyed by Mira Mar residents. Additionally, an attorney representing some of the Mira Mar mobilehome owners testified that the buildings would "completely take away all of the view of the ocean from the uphill properties." Based on this evidence, plaintiffs assert the City abused its discretion by certifying the Final SEIR without analyzing the impacts the project would have on views from their adjacent private property.

■ Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons. (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 734 [3 Cal. Rptr. 2d 488].) Additionally, California landowners do not have a right of access to air, light and view over adjoining property. (*Wolford v. Thomas* (1987) 190 Cal.App.3d 347, 358 [235 Cal.Rptr. 422].) Plaintiffs concede this authority, but claim they are merely attempting to enforce CEQA's requirement that the City identify and mitigate the significant environmental effects of a project before approving it. (CEQA Guidelines, §§ 15002, 15021.)

■ An EIR must identify the "significant environmental effects" of a proposed project. (§ 21100, subd. (b)(1); CEQA Guidelines, § 15126, subd. (a).) For purposes of CEQA, "environment" means physical conditions existing "within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.) Thus, aesthetic issues, such as public and private views, are properly studied in an EIR to assess the impacts of a project. (§ 21100, subd. (d); *Ocean View Estates Homeowners Assn.,*

*Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402–403 [10 Cal.Rptr.3d 451].) However, a lead agency has the discretion to determine whether to classify an impact described in an EIR as "significant," depending on the nature of the area affected. (CEQA Guidelines, § 15064, subd. (b); *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1357 [84 Cal.Rptr.2d 563] [varying thresholds of significance may apply depending on nature of area affected].) In exercising its discretion, a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. (CEQA Guidelines, § 15064, subd. (b).) Where the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion. (CEQA Guidelines, § 15128.)

Based on the threshold criteria for significance presented in the Final SEIR, the City concluded the project would have no significant effects on "Aesthetics/Landform Alteration." Plaintiffs challenge this conclusion, claiming the significance criteria set forth in the Final SEIR did not distinguish between public and private views and the City abused its discretion because substantial evidence revealed that Mira Mar residents would lose their ocean view. While use of the term "scenic vista" in the Final SEIR could possibly refer to views from both public and private vantage points, review of the underlying plans and policies reveal that the City drew a distinction between public and private views, determining that only impairment of the former would constitute a significant impact.

As to "visual resources," the local coastal program included a land use plan that set forth the City's objective of "protect[ing] . . . public enjoyment of Coastal Zone scenic resources" and its policy to "maintain existing view corridors through public rights-of-way." The local coastal program also contained a plan specific to the river, which included a policy stating that the scenic and visual qualities of coastal areas is a resource of public importance and that development is to be sited and designed to protect views.

The Final SEIR indicated that the project was within the river specific plan, specifying that visual qualities must be considered and protected as a resource of public importance. After reviewing the project from four public vantage points, the Final SEIR concluded that the project complied with the City's policy "in that [it] has been designed and sited to protect public views." Because Mira Mar is not a "public vantage point," the Final SEIR concluded that any impact on plaintiffs' private views was not significant and that the project conformed to the policies regarding impact on public views and would have no significant adverse impact on visual quality.

Notwithstanding this conclusion, the draft and Final SEIR indicate that the project is sensitive to the adjacent use and was designed to preserve adjacent "private views," where feasible, by separating the buildings, orientation of on-site structures, subterranean parking, and related design elements. An open corridor of 86 feet at its narrowest point would separate the two residential buildings, with the buildings between 22 and 35 feet away from the closest mobilehomes and the maximum height of the proposed buildings above the elevation of the adjacent mobilehome community would range from 31 to 33 feet. The City also undertook a supplemental airflow and shading study, which concluded that no on-site mitigation was required because the project would have no wind or sun shadow effects.

Plaintiffs acknowledge the policies contained in the City's local coastal program, but contend those policies are immaterial because the Final SEIR did not specify that only scenic views protected by the City's local coastal program would be considered. This argument ignores the fact that upon its adoption, the local coastal program became part of the City's general plan and is vested with the same " 'constitutional' " authority. (*Goleta II, supra,* 52 Cal.3d at p. 571.) Thus, the City's local coastal program set forth the significance criteria used by the City in the Final SEIR and the City properly referenced these policies and determined which view impacts were significant based on the nature of the area affected (public versus private). (CEQA Guidelines, § 15064, subd. (b).)

██ Moreover, as the City indicated in its written response to public comments, neither state nor local law protects private views from private lands and the rights of one private landowner cannot prevail over the rights of another private landowner except in accordance with uniformly applied standards and policies as expressed in the City's general plan, redevelopment plan, local coastal program and zoning ordinances. Because the City applied the policies contained in the local coastal program, we conclude it did not abuse its discretion by concluding that the project would have no significant effects on aesthetics, including views.

C. *The Final SEIR Adequately Mitigated the Significant Biological Effects of the Project*

The project impacts a total of 4.36 acres and will result in the loss of .86 acres of disturbed coastal sage scrub, a significant impact to a sensitive resource. The Final SEIR requires mitigation for this loss at a ratio of 3 to 1, in other words, three square feet of mitigation for every square foot of disturbance, resulting in a total of 2.58 acres of mitigation. To implement this mitigation requirement the Final SEIR requires on-site preservation of .65 acres of coastal sage scrub, restoration and preservation of 1.3 acres of

disturbed coastal sage scrub and the creation of .63 acres of coastal sage scrub. The biological open space would be placed within a conservation easement and managed by a nonprofit management firm under a long-term management plan. The developer is also required to re-vegetate the slopes of the proposed detention basin with coastal sage scrub, although this area would not count toward the total project mitigation. Additionally, the developer would be required to build a barrier to minimize human and domestic animal encroachment and to place signs indicating "Sensitive Biological Habitat" along the perimeter of the project abutting the habitat areas.

Plaintiffs contend the City's mitigation is inadequate because the Final SEIR required it to create or replace a total of 2.58 acres of coastal sage scrub, arguing that the proposed mitigation is illusory and inadequate under CEQA. We disagree.

 An EIR is required to describe feasible mitigation measures that will minimize significant environmental effects identified in an EIR. (§§ 21002.1, subd. (a), 21100, subd. (b)(3); CEQA Guidelines, § 15126.4, subd. (a)(1).) Mitigation may consist of a number of measures, including (1) avoiding an impact by not taking certain action; (2) minimizing impacts by limiting the degree or magnitude of the action; (3) rectifying the impact by repairing, rehabilitating, or restoring the impacted environment; (4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; or (5) compensating for the impact by replacing or providing substitute resources or environments. (CEQA Guidelines, § 15370.) Here, the proposed mitigation measures are adequate because they fall under the latter three categories. New coastal sage scrub habitat will be created, previously disturbed habitat will be restored, undisturbed habitat will be preserved and all of the habitat will be maintained and managed.

While plaintiffs are correct that the project will result in a net loss of .23 acres of coastal sage scrub, the City approved the project, finding that, as mitigated, it would have no significant effect upon the environment. The trial court denied plaintiffs' writ, impliedly finding that substantial evidence supported the Final SEIR's conclusion that the impacts of the project on coastal sage scrub habitat had been mitigated to a level of insignificance. Substantial evidence in the record supported this conclusion. (CEQA Guidelines, § 15384.)

The Department of Fish and Game agreed with the initially proposed mitigation ratio of two to one, commenting that mitigation should be on site and include ongoing removal of exotic plants from the .65 acres of existing coastal sage scrub and the 1.3 acres of disturbed coastal sage scrub. The United States Department of Fish and Wildlife Services similarly agreed that

mitigation should occur on site and include active management to remove non-native plants. The California Coastal Commission expressed concern regarding the preservation of existing habitat as mitigation for the loss of habitat and recommended a 3 to 1 mitigation ratio that could be met through the restoration and enhancement of existing habitat. The City ultimately adopted this recommendation and, as addressed above, properly implemented the 3 to 1 mitigation ratio.

### D. *The City's Findings Were Adequate*

Plaintiffs contend that the City should not have certified the Final SEIR or approved the tentative map for the project because its findings were legally inadequate and not supported by substantial evidence. We disagree.

Section 21081 requires a public agency to make findings for project approvals under CEQA. The CEQA Guidelines require written findings on each significant environmental effect of a project, with each finding supported by substantial evidence and accompanied by a brief explanation of the rationale behind it. (CEQA Guidelines, § 15091, subds. (a) & (b).) Put simply, the findings must "bridge the analytic gap between the raw evidence and ultimate decision" so as to allow a reviewing court "to trace and examine the agency's mode of analysis." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515, 516 [113 Cal.Rptr. 836, 522 P.2d 12].) The public agency must also "specify the location and custodian of the documents or other material which constitute the record of the proceedings upon which its decision is based." (CEQA Guidelines, § 15091, subd. (e).)

Here, the City certified the Final SEIR and approved the tentative map and other substantive permits and entitlements required by the City's redevelopment plan via two separate resolutions adopted on the same day. Before a project is approved, CEQA Guidelines section 15090 require the lead agency to certify an EIR by finding (1) it complies with CEQA, (2) it was presented to the decisionmaking body of the lead agency who reviewed and considered the information contained therein prior to approving the project, and (3) the document reflects the lead agency's independent judgment and analysis. The resolution certifying the Final SEIR contained these required findings. The resolution also attached and incorporated by reference, environmental findings on the significant environmental effects of the project. In turn, these environmental findings incorporated by reference the MEIR and the Plan EIR. The environmental findings also referenced the draft and Final SEIR's for the project and all accompanying reports and studies, indicating the City relied on all these documents in reaching its decision and stating where these documents could be located.

The environmental findings provide the required link between the facts contained in the record and the ultimate findings. First, incorporation by reference of the earlier EIR's and associated documents was sufficient to provide the required link. (*Dore v. County of Ventura* (1994) 23 Cal.App.4th 320, 328 [28 Cal.Rptr.2d 299].) Even if this were not sufficient, the environmental findings list almost two pages of facts supporting the conclusion that the significant environmental effect of the project on coastal sage scrub will be reduced to below a level of significance. Findings were not required on any insignificant environmental effects of the project, such as aesthetics (i.e., views). (§ 21081; CEQA Guidelines, § 15091, subd. (a).) Furthermore, nothing in the record demonstrates or suggests that the City failed to evaluate all potential environmental impacts of the project.

Plaintiffs also claim the environmental findings are not supported by substantial evidence, specifically challenging the findings related to their views and biology. As discussed above, substantial evidence supported these findings. (*Ante*, pts. II.B & C.) Plaintiffs also challenge the findings made in connection with the alternatives; however, as previously discussed (*ante*, pt. II.A), the City was not required to make findings regarding alternatives because all significant project impacts were mitigated to the level of insignificance. Finally, plaintiffs challenge the sufficiency of the evidence supporting the City's finding that the project conforms to the Subdivision Map Act (Gov. Code, § 66410 et seq.) because it will not cause substantial environmental damage. We reject this assertion because the project will not cause any environmental impacts that cannot be mitigated to the point of insignificance. (*Ante*, pt. II.C.)

## DISPOSITION

The judgment is affirmed. The City is entitled to its costs on appeal.

Nares, Acting P. J., and McDonald, J., concurred.

On July 13, 2004, the opinion was modified to read as printed above.