Filed 8/31/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BAY AREA CLEAN ENVIRONMENT, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SANTA CLARA COUNTY et al., <br><br> Defendants and Respondents; <br><br> LEHIGH SOUTHWEST CEMENT COMPANY et al. <br><br> Real Parties In Interest and Respondents. | H040789 <br> (Santa Clara County <br> Super. Ct. No. 1-12-CV229236) |

The Permanente Quarry (Quarry) is a 3,510-acre surface mining operation producing limestone and aggregate for the manufacture of cement, and is located in an unincorporated area of Santa Clara County. The Quarry has been in existence since 1903, and is currently owned by Lehigh Southwest Cement Company and Hanson Permanente Cement (collectively "Lehigh").

At issue in this case is the Santa Clara County Board of Supervisors' (County) 2012 approval of a reclamation plan amendment for closing and reclaiming the Quarry's mining operations over a 20-year period. The County approved the reclamation plan amendment following a review under the California Environmental Quality Act (CEQA)

(Pub. Resources Code, § 21000, et seq.) and certification of an environmental impact report.

Bay Area Clean Environment, Inc. (Bay Area) is a non-profit organization that represents residents of Santa Clara County. On July 26, 2013, Bay Area filed a petition for peremptory writ of mandate challenging the County's approval of the reclamation plan amendment. Bay Area asserted claims under the Surface Mining and Reclamation Act (SMARA) (Pub. Resources Code, § 2710, et seq.) and CEQA.

The trial court denied Bay Area's writ petition, affirming the County's approval of the reclamation plan amendment. Bay Area appeals the denial of the petition, arguing that the trial court erred in affirming the County's decision, because the reclamation plan amendment does not comply with SMARA and CEQA.[1]

## STATEMENT OF THE FACTS AND CASE[2]

The Quarry is located at the end of Permanente Road, which is the continuation of Stevens Creek Road in unincorporated Santa Clara County near the western border of the

---

[1] The Towns of Los Altos Hills and Atherton, and the cities of Cupertino and Los Altos filed an application to file an amicus curiae brief in support of Bay Area. County requested leave to file an objection to the application. We granted County leave to file the objection, and deferred consideration of the application and the objection with the appeal. County's objection to the application to file an amicus brief is overruled and the application is granted.

[2] Bay Area filed a request for judicial notice that we deferred for consideration with the appeal. The first item that is the subject of Bay Area's request is the fact that Midpeninsula Regional Open Space District brought an action against Santa Clara County alleging the same claims as were alleged in the trial court in this case. Midpeninsula filed a notice of appeal in this court in case number H040839 and later dismissed the appeal. We take notice of the action under Evidence Code section 452, subdivision (c).

Bay Area's request that we take judicial notice of information contained in the Federal Register about aquatic life is denied, because it is not properly noticeable under Evidence Code section 452.

2

city of Cupertino. Since 1903, the Quarry has been conducting a surface mining operation producing limestone and aggregate.

In 1939, The Permanente Corporation (Permanente) purchased the Quarry property, which at that time consisted of approximately 1,300 acres. From the date of the original purchase in 1939, Permanente expanded the Quarry's operations, opening new mining areas on the property, and acquiring adjacent land. By 2011, the Quarry had grown to 3,510 acres.

The Quarry has a central pit where limestone and other rock are mined. There are two overburden[3] storage areas surrounding the pit. The Quarry also contains a rock crushing area and administrative offices. The quarry operates within the upper portion of the Permanente Creek watershed. The creek flows east and borders the south side of the pit, then leaves the Quarry property and runs to the bay.

The Quarry's first reclamation plan was approved by the County in 1985, and was meant to be updated after a 25-year period. In 2006, the Department of Conservation found that the Quarry was in violation of SMARA, because the 1985 reclamation plan did not provide a solution for slope instability. In response to the Department of Conservation's finding, the County issued a notice of violation to the Quarry in October 2006, ordering that the 1985 plan be amended to address slope instability, and to expand the boundaries to encompass all areas disturbed by mining.

In addition to slope instability occurring in the Quarry, selenium levels downstream of the Quarry were discovered to be above normal levels. The elevated selenium levels could adversely affect aquatic life in the downstream areas. The selenium levels were the result of mining operations that caused limestone surfaces to be exposed to oxygen and water.

---

[3] Overburden in mining is the "material overlying a deposit of useful geological materials or bedrock." (Merriam-Webster 10th Collegiate Dict. (2001) p. 826.)

3

In April 2007, Lehigh filed an application to amend the 1985 reclamation plan. Since that time, three amendment applications have been filed. The 2007 and 2010 amendments included proposals to open new mining areas to replace the reclaimed pit. Specifically, the 2010 amendment proposed the creation of a new pit in an area south of Permanente Creek, called the South Quarry. The July 2011 application that is the subject of this appeal did not in include the South Quarry proposal, and superseded all earlier applications.

The County issued a draft environmental impact report for public review on December 23, 2011. The County set a 60-day review period, ending February 21, 2012. The County Planning Commission held five workshops to receive public input and comment. In May 2012, the County published the final environmental impact report that consisted of the draft as well as public comments and revisions to the draft. At the June 7, 2012 meeting, the Planning Commission approved the reclamation plan amendment, certified the final environmental impact report, and made CEQA findings.

Following an appeal of the County Planning Commission's action, the County reviewed the reclamation plan amendment. On June 26, 2012, the County voted to approve the reclamation plan amendment and certify the environmental impact report. In doing so, the County found that the reclamation plan amendment was designed to protect water quality and was consistent with SMARA and County ordinances. The County also found that the reclamation plan amendment would achieve compliance with all applicable water standards and the 5.0 micrograms per liter selenium standard. The County found that the potential impacts of excess selenium runoff during the 20-year period of reclamation were significant and unavoidable, because the effectiveness of the mitigation measures during that period was uncertain. Finally, based on information provided by water-quality experts, the County found that a water treatment facility was not feasible

4

because the technology for such a facility would be unproven and the costs were disproportionately high.[4]

On July 26, 2012, Bay Area filed a petition for writ of mandate in the Santa Clara County Superior Court, asserting claims under SMARA and CEQA. On November 29, 2012, the Midpeninsula Regional Open Space District (Midpeninsula) also filed suit alleging CEQA claims. The two actions were consolidated for hearing and on September 13, 2013, the court affirmed the County's approval of the reclamation plan amendment. A consolidated judgment was entered denying both petitions for writ of mandate. Midpeninsula filed a notice of appeal in this court on February 27, 2014, and Bay Area filed its notice on March 3, 2014.

Midpeninsula settled its dispute with Lehigh, and dismissed its appeal on August 20, 2014. Bay Area proceeds with this appeal.

**DISCUSSION**

On appeal, Bay Area asserts that in approving the reclamation plan amendment for the Quarry, the County violated SMARA and CEQA. Bay Area also argues that the trial court erred in allowing the County to augment the administrative record.

*SMARA Claims*

Bay Area argues that the County abused its discretion when it determined that the reclamation plan amendment satisfied SMARA regulatory standards for water quality and wildlife habitat. (Pub. Resources Code, § 2710, et seq.) The reclamation plan amendment in this case was designed to reclaim all of the land affected by mining operations in the Quarry and would occur over a 20-year period.

---

[4] Bay Area filed a motion to strike portions of the County's brief that included information regarding Lehigh's implementation of a water treatment system to reduce selenium levels. This information was not part of the administrative record and was not considered by the County. Bay Area's motion to strike page 19 in the final paragraph beginning, "These protections . . ." through the end of the paragraph on page 20, and page 25, last line, parenthetical phrase "(which is now in operation)" is granted.

SMARA was enacted in 1975 to implement a comprehensive surface mining and reclamation policy, which would, among other objectives, prevent or minimize adverse environmental effects and eliminate residual public health and safety hazards generally attendant to surface mining. (Pub. Resources Code, § 2712.) Also in 1975, the County amended its mining ordinance to require mine operators to periodically obtain a certificate of compliance. A certificate of compliance verifies that existing mining operations comply with permit conditions, County ordinances, and federal and state statutes. (Santa Clara County Code, §§ 16.54.020, 16.54.100.) In 1987, SMARA was amended to require existing mining operations without approved reclamation plans to submit proposed reclamation plans by March 31, 1998 for approval by the lead agency. (Pub. Resources Code, § 2770, subds. (a), (b).) "Reclamation" is land treatment that minimizes the adverse effects of mining operations so that mined lands may be reclaimed to a usable condition. (Pub. Resources Code, § 2733.)

Approval of a reclamation plan under SMARA is reviewed for abuse of discretion pursuant to Code of Civil Procedure section 1094.5. (*Hansen Bros. Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 543.) We consider all reasonable inferences from the administrative record in favor of the agency. (Evid. Code, § 664; *Norris v. State Personnel Bd.* (1985) 174 Cal.App.3d 393, 396.)

### *Water Quality*

SMARA's water quality provisions state the following: "(a) Surface mining and reclamation activities shall be conducted to protect on-site and downstream beneficial uses of water in accordance with the PorterCologne Water Quality Control Act, Water Code section 13000, et seq., and the Federal Clean Water Act, 33 U.S.C. section 1251, et seq. (b) The quality of water, recharge potential, and storage capacity of ground water aquifers which are the source of water for domestic, agricultural, or other uses dependent on the water, shall not be diminished, except as allowed in the approved reclamation

6

plan. (c) Erosion and sedimentation shall be controlled during all phases of construction, operation, reclamation, and closure of a surface mining operation to minimize siltation of lakes and watercourses, as required by the Regional Water Quality Control Board or the State Water Resources Control Board. (d) Surface runoff and drainage from surface mining activities shall be controlled by berms, silt fences, sediment ponds, revegetation, hay bales, or other erosion control measures, to ensure that surrounding land and water resources are protected from erosion, gullying, sedimentation and contamination. Erosion control methods shall be designed to handle runoff from not less than the 20 year/1 hour intensity storm event." (Cal. Code of Reg., tit. 14, § 3706.)

The County found that the reclamation plan amendment met the standards for water quality as set forth in SMARA. In making this finding, the County relied on a hydrologic investigation prepared by Golder Associates that was contained within the reclamation plan amendment itself. The investigation stated different types of water sampling, laboratory analysis and testing, and included the collection of water samples in Permanente Creek and other nearby creeks, groundwater sampling from Quarry wells, and field "wall wash" tests.

In addition to the investigation report, the reclamation plan amendment also contained a water quality report that was prepared by Strategic Engineering & Science, Inc., a company specializing in water analysis. The report contained analysis of water data that had been collected by Golder, and provided a prediction of future water quality if the reclamation plan amendment were to be implemented. The report projected that the strategies stated in the reclamation plan amendment would amount to the water quality meeting acceptable standards. The specific reclamation strategies included backfilling of the Quarry pit and placing non-limestone on the exposed areas of limestone which would reduce the amount of the Quarry's release of selenium. In addition, the Quarry's release of selenium would be reduced by mixing organic matter into the backfill.

7

Bay Area concedes that when completed, the reclamation plan amendment would meet the requirements of California Code of Regulations, Title 14, sections 3706 and 3710. However, Bay Area argues that during the 20-year interim period of the reclamation activities, water quality downstream of the Quarry would deteriorate because there would be an increase in selenium contamination in Permanente Creek. Specifically, Bay Area asserts that during the interim period, selenium-containing limestone and overburden would be deposited in and moved around within the Eastern Mineral Storage Area and the Quarry pit. According to Bay Area, the continued degradation of water quality due to selenium contamination during the interim period would violate SMARA.

Bay Area's argument that the reclamation activities would cause further water contamination and would violated SMARA is inconsistent with the provisions of SMARA itself. Specifically, California Code of Regulations, Title 14, section 3706, subdivision (b) provides that water quality *may* be affected if it is necessary to complete a reclamation plan. Here, according to SMARA, the County had discretion to allow reclamation actions that were necessary to achieve compliance with federal and state water laws, including potential additional selenium deposits in the water. This occurrence as a result of the reclamation activities does not mean that the reclamation plan amendment violates SMARA.

Here, the record supports the County's finding that the reclamation plan amendment complies with SMARA with regard to water quality. The County did not abuse its discretion.

### Wildlife Habitat

In addition to water quality, Bay Area also argues that the reclamation plan amendment does not comply with SMARA's standards for preservation of wildlife habitat. California Code of Regulations, Title 14, section 3703, subdivision (b) provides: "Wildlife habitat shall be established on disturbed land in a condition at least as good as

8

that which existed before the lands were disturbed by surface mining operations, unless the proposed end use precludes its use as wildlife habitat or the approved reclamation plan establishes a different habitat type than that which existed prior to mining."

The California red-legged frog (frog) is protected under the Federal Endangered Species Act, and lives in Permamente Creek downstream of the Quarry pit and the eastern mineral storage area. The frog was found in the lower segment of the creek outside of the reclamation plan amendment's boundary in 1997. The frog has remained confined to this area since its discovery.

Bay Area argues that the reclamation plan amendment does not comply with the wildlife provisions of SMARA, because it does not specifically mention the frog. In addition, Bay Area asserts that the reclamation plan amendment does not protect the frogs that are located downstream of the Quarry from selenium released by the reclamation work itself.

While the reclamation plan amendment does not itself mention the frog, the record in this case shows that a study of wildlife species was appended to the reclamation plan amendment entitled "Biological Resources Assessment," which included a description of the frog's habitat and results of surveys tracking the location of the frog within the vicinity of the Quarry. The assessment stated that because the frog was not found within the reclamation plan amendment boundaries, it would not be directly affected by the reclamation activities. However, the assessment also provided protective measures such as pre-construction surveys and daytime only work to limit the potential risk of harming the frog if it swam upstream into Permanente Creek.

In addition, the environmental impact report analyzed the potential selenium impact to aquatic wildlife downstream of the creek, including the frog. The report recommended measures to mitigate the effect of the selenium runoff. These measures included the study and design of a water treatment facility and water protection measures.

9

However, the report concluded that the impacts of selenium discharge to aquatic life downstream of the Quarry as a result of reclamation activities were significant and unavoidable, because the effectiveness of the proposed mitigation measures was unknown.

In its June 26, 2012 findings, the County adopted the information in the environmental impact report, and imposed new water protections as suggested in the report, and concluded that the selenium runoff impacts were significant and unavoidable.

Contrary to Bay Area's assertion, the record supports the conclusion that impacts of the reclamation activities on the frog as a result of reclamation activities were considered by the County, and were mitigated to the extent possible under the circumstances. The County's conclusion that the reclamation plan amendment ultimately protected the frog and its habitat is supported by the record. The record shows that the reclamation plan will reduce the selenium levels in Permanente Creek and will ultimately improve the conditions for the frog. The reclamation plan amendment also adopted the provisions of the environmental impact report to restrict work near the creek and to conduct pre-construction surveys of the area so that the frog would not be directly affected by the reclamation.

### *Office of Mining Reclamation's Statements Related to SMARA*

Bay Area argues that the statements of the Office of Mining Reclamation to the Department of Conservation that the reclamation plan amendment complied with SMARA were not substantial evidence to support the County's findings in this case.

The Department of Conservation is a state agency that oversees the administration of SMARA in reclamation plans. (See *Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 988-989.) The Department of Conservation reviews all new and amended reclamation plans. (Pub. Resources Code, § 2774, subds. (c) & (d).) In its

10

regulatory role, the Department of Conservation is permitted to appeal and comment at a public hearing to review a reclamation plan. (*Id.*)

Here, based on the statements of the Office of Mining Reclamation, the Department of Conservation made a formal determination that the reclamation plan amendment complies with the standards set forth in SMARA, including those for water quality and wildlife habitat. (Code of Regulations, tit. 14, §§ 3703, 3706.) The Department of Conservation's conclusion that the reclamation plan amendment complied with SMARA constitutes substantial evidence upon which the County relied in its findings.

### Conclusion on the SMARA Claims

We find that the County did not abuse its discretion when it determined that the reclamation plan amendment satisfied SMARA's regulatory standards for water quality and wildlife habitat. (Pub. Resources Code, §§ 2710, et seq.) In addition, the statements of the Office of Mining Reclamation were properly considered by the County and provided substantial evidence to support the County's findings.

### CEQA Claims

Bay Area asserts that the environmental impact report for the reclamation plan amendment violates the provisions of CEQA. Specifically, Bay Area argues that the environmental impact report does not state a sufficient cumulative impact analysis, and that the County's CEQA findings supporting certification of the report are not supported by substantial evidence.

"A public agency must prepare an [environmental impact report] or cause an [environmental impact report] to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment. (Pub. Resources Code, §§ 21100, subd. (a), 21151, subd. (a); Guidelines, § 15064, subd. (a)(1).) The [environmental impact report] must describe the proposed project and its environmental

11

setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements. (Pub. Resources Code, §§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125.)

"The agency must notify the public of the [draft environmental impact] report, make the draft [environmental impact report] and all documents referenced in it available for public review, and respond to comments that raise significant environmental issues. (Pub. Resources Code, §§ 21091, subds. (a), (d), 21092; Guidelines, §§ 15087, 15088.) The agency also must consult with and obtain comments from other agencies affected by the project and respond to their comments. (Pub. Resources Code, §§ 21092.5, 21104, 21153; Guidelines, § 15086.) It must prepare a final [environmental impact report] including any revisions to the draft [environmental impact report], the comments received from the public and other agencies, and responses to comments. (Guidelines, §§ 15089, subd. (a), 15132.)

"An agency may not approve a project that will have significant environmental effects if there are feasible alternatives or feasible mitigation measures that would substantially lessen those effects. (Pub. Resources Code, §§ 21002, 21002.1, subd. (b); Guidelines, § 15021, subd. (a)(2); [citation].) An agency may find, however, that particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects. (Pub. Resources Code, § 21081, subds. (a)(3), (b); Guidelines, § 15091, subd. (a)(3).) Specifically, an agency cannot approve a project that will have significant environmental effects unless it finds as to each significant effect, based on substantial evidence in the administrative record, that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effect; (2) those measures are within the jurisdiction of another public agency and have been

12

adopted, or can and should be adopted, by that agency; or (3) specific economic, legal, social, technological, or other considerations make the mitigation measures or alternatives identified in the [environmental impact report] infeasible, and specific overriding economic, legal, social, technological, or other benefits outweigh the significant environmental effects.  (Pub. Resources Code, §§ 21081, 21081.5; Guidelines, §§ 15091, subds. (a), (b).)  A finding that specific overriding project benefits outweigh the significant environmental effects (Pub. Resources Code, § 21091, subd. (b)) is known as a statement of overriding considerations.  (Guidelines, § 15093.)

"Thus, a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process.  The purpose of these requirements is to ensure that public officials and the public are aware of the environmental consequences of decisions before they are made." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1197-1198, fns. omitted.)

CEQA depends on the environmental impact report. "An environmental impact report is an informational document" the purpose of which "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list the ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061)  According to our Supreme Court,  "The purpose of an [environmental impact report] is to give the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the environment but also informed self-government." ' [Citation.]  The [environmental

13

impact report] is the heart of CEQA, and the mitigation and alternatives discussion forms the core of the [environmental impact report]." (*In re Bay-Delta Etc.* (2008) 43 Cal.4th 1143, 1162.)

Once the environmental impact report has been adopted, the scope of judicial scrutiny proceeds along two paths. " 'Section 21168.5 [of the Public Resources Code] provides that a court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." As a result of this standard, "The court does not pass upon the correctness of the [environmental impact report's] environmental conclusions, but only upon its sufficiency as an informative document." [Citation.]' [Citations.] 'We may not set aside an agency's approval of an [environmental impact report] on the ground that an opposite conclusion would have been equally or more reasonable.' [Citation.] [¶] 'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' [Citation.]" (*In re Bay-Delta Etc., supra,* 43 Cal.4th 1143, 1161-1162.)

"The agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. [Citation.] ' "Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure." ' [Citation.] 'A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be

14

better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.' [Citation.] '[T]he relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program. In the absence of contrary evidence, we presume regular performance of official duty. (Evid.Code, § 664.)' " (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 918-919.) Every court "presumes a public agency's decision to certify the [environmental impact report] is correct, thereby imposing on a party challenging it the burden of establishing otherwise." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.)

Legal error, in the form of failure to comply with CEQA, is reviewed independently, but all factual determinations are reviewed according to the substantial evidence standard. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427, 435.) "The substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an [environmental impact report's] analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the [environmental impact report] relied because these types of challenges involve factual questions." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.)

A substantial evidence challenge is subject to an important proviso: "As with all substantial evidence challenges, an appellant challenging an [environmental impact report] for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)

15

### *Cumulative Impact of the Reclamation Plan Amendment*

Bay Area asserts that the environmental impact report for the reclamation plan amendment was inadequate, because it failed to address the cumulative impact of the new South Quarry pit that had previously been proposed to replace the reclaimed pit. Specifically, Bay Area argues that the reclamation plan amendment implicitly relies on the establishment of a new pit in the South Quarry to replace the reclaimed North Quarry pit, and the new pit was not included in the reclamation plan or considered in the environmental impact report.

Bay Area cites the primary objectives of the reclamation plan amendment, which were to "maintain a local, reliable, and economic source of cement-grade limestone and to continue operations of the existing quarry." (Emphasis omitted.) Bay Area asserts that the only way to achieve the stated objective was to open a new quarry pit to replace the one being reclaimed.

Bay Area notes that the 2010 comprehensive plan amendment that immediately preceded the approved 2011 reclamation plan amendment included an application for a use permit for a new South Quarry pit. Bay Area theorizes that in order for Lehigh to achieve quick approval of the reclamation plan amendment so that it could continue to supply cement to California public agencies, it removed the application for a use permit for South Quarry pit from the reclamation plan amendment.

Bay Area argues that the new quarry pit was a reasonably foreseeable future project, and it should have been included in the environmental impact report in order to comply with CEQA. Bay Area makes this argument based in part on the concept that segmentation of proposed projects should be avoided. "Segmentation" refers to the division of a project into pieces, thereby avoiding review of the physical impact of the project as a whole. "A public agency may not divide a single project into smaller individual projects in order to avoid its responsibility to consider the environmental

16

impacts of the project as a whole." (*Sierra Club v. West Side Irrigation Dist*. (2005) 128 Cal.App.4th 690, 698.)  "CEQA mandates that environmental considerations do not become submerged by chopping a large project into many little ones, each with a potential impact on the environment, which cumulatively may have disastrous consequences." (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 592.)  "A project under CEQA is the whole of an action which has a potential for resulting in a physical change in the environment, directly or ultimately, and includes the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies." (*Ibid*.)

The record contains no support for Bay Area's assertion that the County segmented the review of the reclamation plan amendment.  The application for a use permit for the South Quarry was withdrawn before the final iteration of the reclamation plan amendment was subjected to the environmental impact report.  The new pit (if it were a subsequent project) would not change the scope of the nature of the reclamation of the North Quarry pit or the reclamation's environmental effects.  (See *Laurel Heights Improvement Assoc. of San Francisco*, *Inc. v. The Regents of the University of California* (1988) 47 Cal.3d 376, 396.)  The reclamation plan amendment in this case is a stand-alone project and does not require approval of a future project, such as the South Quarry pit for reclamation of the North Quarry to occur.

*City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325 (*City of Antioch*), relied upon by Bay Area, is distinguishable.  In that case, the project at issue was an infrastructure system on four parcels of undeveloped land, which was designed to serve subsequent development on the land.  It was conceded that the sole and exclusive purpose of the infrastructure development at issue was "to provide a catalyst for further development in the immediate area." (*Id*. at p. 1337.)  The court addressed the question of whether a negative declaration was a sufficient environmental document for this

17

project. It found that an environmental impact report must be prepared since it was reasonably certain that development would follow, even though permits had not been applied for. The infrastructure by itself had no independent utility and served no purpose other than to facilitate development at that site. By issuing the permit for the first stage of the development, the agency had committed itself to the second phase. Therefore, the court concluded, "[c]onstruction of the roadway and utilities cannot be considered in isolation from the development it presages." (*Id*. at p. 1336.)

In contrast to *City of Antioch*, here the reclamation plan amendment is not a first phase in a larger development. It is the complete process by which the North Quarry will be reclaimed, and does not require approval of other future projects to be completed.

In sum, the environmental impact report sufficiently reviewed the project proposed in the reclamation plan amendment, and did not omit to review a possible replacement quarry pit.

### *Adequacy of the County's CEQA Findings to Support Certification*

Bay Area argues that the County's findings supporting certification of the environmental impact report were insufficient, because they were not supported by substantial evidence. Specifically, Bay Area asserts that the findings are insufficient because they do not state that the impacts of the plan on the frog were significant and unavoidable, or that the impact could be adequately mitigated. In addition, Bay Area argues that the statement of overriding considerations was deficient because it did not address the significant impacts on the frog.

Impact 4.4-4 is entitled "Project activities could result in adverse negative effects on special status aquatic organisms. (*Less than significant impact*)." (Emphasis in original.) The Impact states "[The frog] is the only special status aquatic species of concern in the Study Area. However, no [frogs] have been found during surveys in the Project Area. Upland migration habitat for [the frog] is not present in the Project Area,

18

preventing significant movements of this species in the Project Area [record citation]. [¶] Consequently, it is considered unlikely for the species to occur in the Project Area and therefore no direct impacts to special status aquatic species would be expected to result from Project activities."

With regard to the direct impacts on the frog from reclamation activities, the environmental impact report states that the impacts were less than significant. This conclusion is supported by substantial evidence in the record. Most notably, the evidence of less than significant impact is demonstrated by the facts that support the finding that the plan complies with SMARA.[5] Under CEQA, additional findings regarding mitigation of impact are required only when the findings show a significant impact. (Pub. Resources Code, § 21081; Cal. Code Regs., tit. 14, § 15091.) If the direct potential impacts are less than significant, no additional findings are required. Here, in Impact 4.4-4, the environmental impact report concluded that the direct potential impacts of the reclamation plan on the frog were less than significant. As a result, contrary to Bay Area's assertion, additional findings regarding Impact 4.4-4 were not required. (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2008) 44 Cal.4th 459, 522; *Mira Mar Mobile Community. v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492-493.)

To the extent Bay Area is referring to the indirect potential impacts to the frog from reclamation activities, Impact 4.4-5 of the environmental impact report discusses the risks to aquatic life, of which the frog is included, from excess selenium runoff in the downstream areas. The report states that the potential impact is significant and unavoidable. Consistent with the requirements of CEQA, Impact 4.4-5 also states the

_____

[5] Bay Area also asserts that the findings are insufficient because they rely in part on a conclusion that the reclamation plan amendment does not violate SMARA. As stated *supra*, the County properly found that the reclamation plan amendment satisfied the provisions of SMARA.

mitigation measures that would be applicable, including interim storm water control and sediment management, and an interim storm water monitoring plan in the eastern material storage area of the Quarry. These specific mitigation measures are described in detail in the environmental impact report. These statements of the indirect impacts to the frog are supported by substantial evidence in the record and comply with the CEQA requirements.

Finally, Bay Area argues that the statement of overriding considerations was defective because it did not specifically direct significant impacts to the frog. However, as discussed above, the finding that there was a less than significant impact on the frog from the reclamation activities is supported by substantial evidence. As a result, CEQA does not require a statement of overriding considerations because the potential direct impacts to the frog were found to be less than significant. (Cal. Code Regs., tit. 14, § 15093.)

### *Augmentation of the Administrative Record*

Bay Area argues that the trial court erred in granting Lehigh's motion to augment the administrative record to include an e-mail exchange between Dr. Mark Jennings, a herpetologist who conducted studies and contributed reports about the frog during the environmental review process, and David Johnston of the California Department of Fish and Wildlife. The e-mail discussed inconsistencies in Jennings's prior reports about his observation of the frog in Pond 13, which is within the boundaries of the reclamation plan amendment.

In his 2006 and 2007 reports, Jennings stated that the frog inhabited Pond 13, a location farther upstream from where it had ever been previously found, and within the boundaries of the reclamation plan amendment. In subsequent reports, however, Jennings did not include any reference to the frog being located in Pond 13.

20

Jennings sent an e-mail to Johnston in 2009, stating that he had erred in his 2007 report when he said that he had observed the frog in Pond 13. Jennings opined that the error was likely the result of a typographical mistake in the numbering of the map of the Quarry. Jennings further reiterated to Johnston that he had never observed the frog in Pond 13, and that this was consistent with what he had told Johnston in the field.

The contents of the administrative record, are governed by Public Resources Code section 21167.6, subdivision (e), which states: "The record of proceedings shall include, but is not limited to, all of the following items . . . ." Subdivision (e) includes 11 categories of material that must be included in the administrative record. *(Madera Oversight Coal. , Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 63, disapproved on other grounds in Neighbors for Smart Rail v. Exposition Metro Line Const. Authority (2013) 58 Cal.4th 439.)

In the present case, the e-mail exchange falls within subdivision (e)(10) of the Public Resources Code section 21167.6, which states that an administrative record includes "any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division."

Here, the e-mail exchange was properly part of the administrative record. Jennings wrote the e-mail in 2009, and that e-mail was communicated to the firm that prepared the biological resources assessment for the environmental review process. The draft environmental impact report relied on the biological resource assessment in stating its

21

findings. Evidence of the presence or absence of the frog in the reclamation area that was relied upon by the firm completing the biological study for the environmental review process falls within the parameters of Public Resources Code section 21167.6, subdivision (e) for inclusion in the administrative record.

### *Conclusion on the CEQA Claims*

We find that the County properly certified the environmental impact report and approved the reclamation plan amendment in compliance with CEQA. The County's findings regarding the direct and indirect environmental impacts from the reclamation plan amendment were sufficient under CEQA. Finally, the administrative record properly included information about the location of the frog relevant to the reclamation area boundaries.

**DISPOSITION**

The order denying Bay Area's petition for writ of mandate is affirmed.

_____

RUSHING, P.J.


WE CONCUR:


_____

PREMO, J.


_____

ELIA, J.


*Bay Area Clean Environment, Inc. v. Santa Clara County et al.*
**H040789**

23

Trial Court:                                         Santa Clara County Superior Court
Superior Court No.:  1-12-CV229236

Trial Judge:                                       The Honorable Joseph Huber

Attorneys for Plaintiff and Appellant        Stuart M. Flashman
Bay Area Clean Environment, Inc.:

Attorneys for Defendants and Respondents    Office of the County Counsel
Santa Clara County et al.:

Orry P. Korb
Elizabeth G. Pianca

Harrison, Temblador, Hungerford &
Johnson

Mark D. Harrison
Sean K. Hungerford

Attorneys for Amicus Curiae:              Babak Naficy
Towns of Los Altos and Atherton and the
Cities of Cupertino and Los Altos:

***Bay Area Clean Environment, Inc. v. Santa Clara County, et al.***
**H040789**